749 A.2d 832

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. LUIS A. CRUZ, JR., DEFENDANT–RESPONDENT.

Argued January 4, 2000—Decided May 8, 2000.

404

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for appellant (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney; *Ms. Foddai* and *Linda A. Rinaldi,* Deputy Attorney General, of counsel and on the briefs).

*James K. Smith, Jr.,* Assistant Deputy Public Defender, argued the cause for respondent (*Ivelisse Torres,* Public Defender, attorney).

The opinion of the Court was delivered by

STEIN, J.

This capital murder case, on interlocutory appeal, requires the Court to establish the appropriate jury instruction for serious bodily injury (SBI) capital murder. We also consider the state-of-mind requirement for SBI murder and whether the Code of Criminal Justice, *N.J.S.A.* 2C:1–1 to 104–9 (Code), contemplates prosecutions for both capital and non-capital SBI murder.

SBI murder is the purposeful or knowing infliction of "serious bodily injury resulting in death." *N.J.S.A.* 2C:11–3a(1) and (2). It is a form of murder that, since the so-called *Gerald* amendment to our state's constitution in November 1992, *N.J. Const.* Art. I, ¶ 12, may result in the imposition of the death penalty. *N.J.S.A.* 2C:11–3. In *State v. Simon,* 161 *N.J.* 416, 737 *A.*2d 1 (1999), we held that only purposely or knowingly causing serious bodily injury that creates a substantial risk of death satisfies the serious bodily injury capital murder requirement. There we said that "an injury that creates a substantial risk of death means one from which death is practically certain to ensue." *Id.* at 449, 737 *A.*2d 1. We acknowledge that that definition results in only a minimal distinction between knowing murder and knowing or purposeful SBI murder. Accordingly, we reconsider the definition of "substantial risk of death" in the context of SBI murder.

I

On December 11, 1995 seventy-four-year-old Santina Leonardi, the owner of a combination convenience store and home in Wool-

wich Township, was found dead on the floor of the store by her granddaughter. Mrs. Leonardi had been beaten about the head and face and stabbed fourteen times. A broken knife blade was embedded in Mrs. Leonardi's chest. Thirteen of the fourteen stab wounds penetrated the heart and major blood vessels surrounding the heart. The other wound was a defensive wound to her hand. Mrs. Leonardi was pronounced dead at the scene.

The Gloucester County Prosecutor's homicide investigation eventually focused on defendant Luis A. Cruz, Jr. On February 24, 1996 co-defendant Jorge Pinto–Rivera agreed to wear a body wire and thereafter had several conversations with defendant. The statements made by defendant during those conversations were insufficient, however, to support the issuance of an arrest warrant. Subsequently, on February 26, 1996, Pinto–Rivera had a telephone conversation with defendant that was monitored. During the conversation Pinto–Rivera asked defendant the name of the woman that he had murdered and defendant responded with the name of the decedent, Mrs. Leonardi. Defendant also said that he was alone when he committed the murder. Based on that evidence, defendant was arrested and charged with the murder of Mrs. Leonardi.

During his post-arrest interrogation, defendant made a taped statement confessing to Mrs. Leonardi's murder. He said that an unspecified person had threatened to shoot him if he did not steal the deed to her house from Mrs. Leonardi. Defendant said that he and Pinto–Rivera went to the victim's convenience store after it was closed to rob her of the deed, and that during the robbery Pinto–Rivera knocked Mrs. Leonardi to the floor. Defendant said he stabbed her because she knew him and could identify him. However, he claimed that he stabbed Mrs. Leonardi only twice, and that after he left the store co-defendant Pinto–Rivera reentered the store alone and remained there for a short time before the two left the area. Defendant now denies any involvement in the robbery or the murder. Co-defendant Pinto–Rivera was arrested and pled guilty to armed robbery and other offenses.

A Gloucester County Grand Jury returned an indictment charging defendant with capital murder and other related offenses. The County Prosecutor chose to prosecute defendant capitally and filed a Notice of Aggravating Factors alleging that the murder was committed for the purpose of escaping detection, *N.J.S.A.* 2C:11–3c(4)(f), and that the murder was committed while defendant was engaged in the commission of a robbery, *N.J.S.A.* 2C:11–3c(4)(g).

Selection of a capital jury began on September 13, 1999. Individual *voir dire* of the jurors began on September 21, 1999. The trial court, believing that this Court's opinion in *State v. Simon, supra,* 161 *N.J.* 416, 737 *A.*2d 1, was susceptible to more than one interpretation regarding the appropriate jury charge for SBI murder, requested and received interpretations of the *Simon* opinion from both parties. Accepting the jury charge submitted by the defense, the trial court instructed each prospective juror during the *voir dire* that the law of capital murder was as follows:

> In order to be able to seek the death penalty the State must first prove beyond a reasonable doubt that the defendant by his own conduct committed what is called a purposeful or knowing murder.
>
> A purposeful murder is one in which it was the defendant's purpose or conscious object or intention to cause the death of his victim and did cause it. A knowing murder is one in which the defendant knew or was aware that what he did was practically certain to result in the victim's death.
>
> Another way of a murder being a purposeful or knowing murder is if the defendant had the purpose to inflict serious bodily injury on the victim, where the injury is such that death is practically certain to ensue, and at that time that the defendant was aware that his actions were practically certain to cause the death of a victim, and that person did, in fact, die, then this serious bodily injury type of murder is a form of murder that is potentially eligible for the death sentence.
>
> That is the basic threshold for someone to even be possibly considered for the death penalty, that all 12 jurors unanimously find beyond a reasonable doubt that the defendant is guilty of committing that kind of murder, that is, a purposeful or knowing murder by his own conduct.

On October 22, 1999, following oral arguments on the issue, the trial court ruled that the charge at trial regarding SBI murder would be the same as that given to potential jurors during the *voir dire* process. The charge was to read as follows:

However, for a defendant to be subject to capital punishment, all jurors must unanimously agree that the State's proofs establish beyond a reasonable doubt that the defendant either purposely or knowingly caused death or serious bodily injury resulting in death, which injury was of such a nature that death was practically certain to result from it, and the defendant knew that such injury was practically certain to cause her death.

The Prosecutor's request for a stay of the trial pending interlocutory appeal of the court's charge on SBI murder charge was denied. On October 25, 1996 the sixteen-member petit jury was selected but not sworn. During jury selection the Prosecutor moved for leave to appeal the trial court's determination concerning the SBI murder charge to the Appellate Division. That court granted a stay of the trial, leave to appeal, and ordered that the jury not be sworn. The Attorney General filed a brief as *amicus curiae* with the Appellate Division proposing a third variation of the SBI murder charge.

On November 3, 1999 the Appellate Division in an unpublished opinion disapproved of the trial court's charge with respect to the requirement that the State prove that defendant knew that the injury was practically certain to cause Mrs. Leonardi's death. Dismissing the Attorney General's position as moot, the Appellate Division ordered that the proposed jury charge submitted by the Prosecutor be used by the trial court. That charge reads:

To find defendant guilty of murder all jurors must unanimously agree that defendant purposely or knowingly caused death or that he purposely or knowingly caused serious bodily injury which then results in death, but all jurors do not have to agree unanimously as to which form of murder is present so long as all believe it was one form of murder or the other. However, for a defendant to be subject to capital punishment, all jurors must agree that the defendant either purposely or knowingly caused death or serious bodily injury which then results in death.

That same day the Prosecutor moved before the trial court to dismiss the jury because of the erroneous instruction previously given it during the *voir dire* portion of jury selection. The court denied the motion and also denied a stay of the trial pending interlocutory appeal. On November 4, 1999 the Prosecutor moved for leave to appeal to the Appellate Division. The next day, November 5, the Appellate Division affirmed the trial court's denial of the motion to discharge the jury but granted a stay of

further proceedings, including swearing in the jury, pending leave to appeal to this Court. On November 5, 1999 the Prosecutor sought emergent leave to appeal to this Court. That same day the Attorney General superseded the Gloucester County Prosecutor on behalf of the State, and filed his own motion for leave to appeal seeking clarification of the SBI murder charge. On November 9, 1999 this Court granted the Attorney General's motion for leave to appeal, discharged the unsworn jury, stayed all further proceedings and dismissed the Gloucester County Prosecutor's motion for appeal as moot.

## II

The history and provisions of New Jersey's death penalty act are well documented elsewhere. See *State v. Ramseur*, 106 *N.J.* 123, 156–60, 524 *A.2d* 188 (1987). A brief summary will suffice to illuminate the precise issues before us.

When the Legislature restored the death penalty in 1982, it did not enact a new murder statute but instead grafted capital punishment provisions onto the existing statute. Accordingly, those who purposely or knowingly caused death or serious bodily injury resulting in death became eligible for the death penalty. *N.J.S.A.* 2C:11–3a(1) and (2). The Code provides that "[a] person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result," *N.J.S.A.* 2C:2–2b(2), and that "[a] person acts purposefully with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result." *N.J.S.A.* 2C:2–2b(1).

By its literal terms, therefore, one who intended to cause only serious bodily injury that resulted in death was subject to the death penalty. *N.J.S.A.* 2C:11–3a(1) and (2). In *State v. Ramseur*, however, this Court expressed skepticism that intent to commit only serious bodily injury would be sufficient to support a capital sentence "because of the constitutionally required culpability standards regarding a capital defendant's intent to kill." 106

*N.J.* at 194, 524 *A.*2d 188. We referred to a then recent United States Supreme Court decision in which the Supreme Court had considered the constitutionality of imposing the death penalty on an actor who did not intend to kill another. *Ibid.* In *Enmund v. Florida,* 458 *U.S.* 782, 797, 102 *S.Ct.* 3368, 3376, 73 *L.Ed.*2d 1140, 1151 (1982), the United States Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment prohibited capital punishment of a defendant who did not "kill, attempt to kill, or intend that a killing take place or that lethal force would be employed." Subsequently, in *Tison v. Arizona,* 481 *U.S.* 137, 157–58, 107 *S.Ct.* 1676, 1688, 95 *L.Ed.*2d 127, 144 (1987), the Supreme Court narrowed that holding, permitting capital punishment to be imposed on a defendant who was a major participant in a felony that resulted in murder and who acted with reckless indifference to human life. In *Ramseur, supra,* we noted that our Code does not permit imposition of the death penalty on one who did not commit the homicidal act "by his own conduct," 106 *N.J.* at 193, 524 *A.*2d 188, thereby precluding from death eligibility accomplices to persons who cause death during commission of a felony as well as murder committed as an accomplice or co-conspirator, except as provided in *N.J.S.A.* 2C:11–3c.

In *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), this Court determined that, although the death penalty act by its literal terms extended the death penalty to those who purposely or knowingly caused serious bodily injury resulting in death, the Legislature did not contemplate so broad an application of the death penalty. *Id.* at 89–90, 549 *A.*2d 792. We observed that "[t]he failure to distinguish, for purpose of punishment, those who intend the death of their victim from those who do not does violence to the basic principle . . . that 'the more purposeful the conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished.'" *Id.* at 85, 549 *A.*2d 792 (quoting *Tison, supra,* 481 *U.S.* at 156, 107 *S.Ct.* at 1687, 95 *L.Ed.*2d at 143). Thus, we found that the "failure to make that distinction also creates gross disproportionality in light of the

penalties imposed on conviction for crimes such as aggravated assault, ... aggravated manslaughter, ... and felony-murder." *Ibid.* Accordingly, we held, on state constitutional grounds, that the imposition of the death penalty on one who intended only to inflict serious bodily injury and who acted without purpose to cause death or knowledge that death would ensue would be grossly disproportionate and would constitute cruel and unusual punishment. *Id.* at 89, 91, 549 *A.*2d 792. In his separate opinion, Justice O'Hern concluded on the basis of the internal structure of the Code that the Legislature would not have intended that SBI murder be death-eligible unless the defendant intended death or knew that death was practically certain to occur. *Id.* at 140–41, 549 *A.*2d 792 (O'Hern, J., concurring).

Following our decision in *Gerald, supra,* we said that "[i]f the evidence provides a rational basis for a jury to convict a defendant of either intentional or serious-bodily-injury murder, the trial court 'must instruct the jury to specify which, if [either], of those findings forms the basis for a conviction.'" *State v. Harvey,* 121 *N.J.* 407, 413, 581 *A.*2d 483 (1990) (quoting *State v. Coyle,* 119 *N.J.* 194, 209, 574 *A.*2d 951 (1990)). Trial courts therefore instructed juries in SBI murder cases with a *"Gerald* trigger charge," which distinguished homicide with intent to kill from homicide with intent to cause only serious bodily injury that nevertheless resulted in death. *Judges Bench Manual for Capital Causes,* Appendix F(2) (March 1, 1998).

Meanwhile, and based on our decision in *Gerald, supra,* this Court set aside several death penalty sentences in capital cases. *E.g., Harvey, supra,* 121 *N.J.* at 414, 581 *A.*2d 483; *State v. Pennington,* 119 *N.J.* 547, 560–65, 575 *A.*2d 816 (1990); *State v. Long,* 119 *N.J.* 439, 460–64, 575 *A.*2d 435 (1990); *Coyle, supra,* 119 *N.J.* at 212, 574 *A.*2d 951; *State v. Jackson,* 118 *N.J.* 484, 492–93, 572 *A.*2d 607 (1990); *State v. Davis,* 116 *N.J.* 341, 374–75, 561 *A.*2d 1082 (1989). Because those cases were tried prior to the *Gerald* decision, the trial courts, when charging the jury, had made no distinction between SBI murder and purposeful or knowing mur-

der. In the Court's view, the evidence in those cases provided a rational basis for a jury to find that the defendant intended only to cause serious bodily injury and not death.

In response to the reversal of those death penalty sentences, and apparently to prevent defendants from avoiding the death penalty for heinous murders in cases in which it is more difficult to prove an intentional killing than to prove that the defendant intended to cause serious bodily injury that results in death, the Legislature proposed a constitutional amendment. On November 3, 1992, the electorate voted to amend the State Constitution to provide that SBI murders may be subject to the death penalty. *N.J. Const.* Art. I, ¶ 12 (adding a sentence that provides: "It shall not be cruel and unusual punishment to impose the death penalty on a person convicted of purposely or knowingly causing death or purposely or knowingly causing serious bodily injury resulting in death who committed the homicidal act by his own conduct or who as an accomplice procured the commission of the offense by payment or promise of payment of anything of pecuniary value."). Subsequent to the constitutional amendment, the Legislature amended the murder statute and redefined a "homicidal act" as "conduct that causes death or serious bodily injury resulting in death." *N.J.S.A.* 2C:11–3i.

In *State v. Harris,* 141 *N.J.* 525, 662 *A.*2d 333 (1995), a case in which the homicide took place before the post-*Gerald* constitutional amendment and, therefore, one in which the *Gerald* distinction applied, we observed that in "formulating charges to juries in future cases ... the mental state required for a capital conviction based on SBI murder should be consonant with the federal constitutional mandate ... that the actor be recklessly indifferent to whether the result of the conduct would be death." *Id.* at 548, 662 *A.*2d 333. The Code provides that a "person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." *N.J.S.A.* 2C:2–2b(3). In March 1998, the Trial Judges Committee On

Capital Causes redrafted the model murder charge to include the reckless indifference requirement of *Harris*. That charge reads:

[F]or a defendant to be subject to capital punishment, all jurors must agree that the defendant either purposely or knowingly caused death or serious bodily injury resulting in death while demonstrating reckless indifference as to whether his conduct would cause death.

To establish reckless indifference the State must therefore prove beyond a reasonable doubt that the defendant was aware of and consciously disregarded a substantial and unjustifiable risk that death would result from his or her conduct. The State must also prove beyond a reasonable doubt that the act was so reckless that it reflected a wanton disregard or complete indifference to the risk of causing death. In other words, the evidence must satisfy you beyond a reasonable doubt that the defendant acted in such a manner as to demonstrate that he recklessly disregarded the risk of causing death and did not care whether the victim lived or died, despite being aware that there was a substantial and unjustifiable risk that death of the victim would probably result from his conduct.

[*Judges Bench Manual for Capital Causes, supra,* Appendix F(2) (internal punctuation omitted).]

Subsequently, in *Simon, supra,* we noted that in cases where both SBI capital murder and aggravated manslaughter are charged to the jury, inclusion of the "reckless indifference" language in the charge "conceivably could lead to some confusion." 161 *N.J.* at 452, 737 *A.*2d 1. The potential confusion referred to in *Simon* stems from the inclusion of the word "reckless" in the model jury charges for both aggravated manslaughter (a non-death-eligible crime) and for SBI murder (a death-eligible crime). The jury instruction for a charge of aggravated manslaughter states that a person is guilty of aggravated manslaughter if he or she recklessly causes the death of another person under circumstances manifesting extreme indifference to human life. *Model Jury Charges (Criminal),* (April 20, 1998). As noted, the redrafted SBI murder instruction stated that "for a defendant to be subject to capital punishment, all jurors must agree that the defendant either purposely or knowingly caused death or serious bodily injury resulting in death while demonstrating reckless indifference as to whether his conduct would cause death." *Judges Bench Manual for Capital Causes, supra,* Appendix F(2). To resolve the possible confusion we recommended that the Trial

Judges Committee On Capital Causes re-examine the charge. *Simon, supra,* 161 *N.J.* at 452, 737 *A.*2d 1.

More relevant to the issues in this case was the *Simon* defendant's claim that, when pleading guilty to capital murder, his factual statements to the trial court regarding his mental state at the time of the murder did not satisfy the state-of-mind requirement necessary for a conviction of purposeful or knowing murder. *Id.* at 447, 737 *A.*2d 1. Rather, the defendant contended that his state of mind at the time of the commission of the murder reflected only a reckless state of mind. *Ibid.* We observed that a charge of SBI murder does not "require proof that the actor acted with purpose or knowledge that death would result from his or her conduct." *Id.* at 451, 737 *A.*2d 1. We stated that "only purposely or knowingly causing serious bodily injury, which creates a substantial risk of death, can satisfy the SBI capital murder requirement. Objectively speaking, an injury that creates a substantial risk of death means one from which death is practically certain to ensue." *Id.* at 448–49, 737 *A.*2d 1. Thus, "in order to convict a defendant of SBI capital murder, a prosecutor must prove that a defendant purposely or knowingly caused an injury from which death is practically certain to ensue." *Id.* at 449, 737 *A.*2d 1.

We acknowledge that the instruction we proposed in *Simon* might in some circumstances be difficult for jurors to apply. That instruction leaves only a minimal distinction between knowing murder, where an actor's conduct is practically certain to cause death, and purposeful or knowing SBI murder, where an actor's conduct is practically certain to cause an injury that is practically certain to cause death. In the context of that instruction, the distinction between knowing murder and knowing or purposeful SBI murder is so subtle that it has the capacity to blur any distinction between those crimes. We are certain that the Legislature did not intend to eliminate the crime of knowing SBI murder. Our revised jury instruction, *infra* at 419–20, 749 *A.*2d at 841, illuminates the distinction between knowing murder and knowing or purposeful SBI murder.

## III

The parties dispute the definition of "substantial risk of death" in the context of SBI capital murder. They also disagree on what state of mind, if any, the State must prove defendant possessed with respect to the result of the serious bodily injury.

### A

The Code defines "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." *N.J.S.A.* 2C:11–1b. In *Simon, supra,* we equated "substantial risk of death" with "practical certainty of death" when we held that "in order to convict a defendant of SBI capital murder, a prosecutor must prove that a defendant purposely or knowingly caused an injury from which death is practically certain to ensue." 161 *N.J.* at 449, 737 *A.*2d 1. The legislative intent underlying the *Gerald* amendment apparently was to extend death-penalty eligibility to those defendants who may have acted without a specific intent to kill, but whose intent nevertheless was substantially equivalent to an intent to kill and who inflicted injuries of such severity that death was almost inevitable. Accordingly, we now clarify the definition of serious bodily injury for purposes of SBI murder and distinguish it from definitions of serious bodily injury that apply in similar crimes, thereby complying with constitutional requirements of narrowing and proportionality. *Furman v. Georgia,* 408 *U.S.* 238, 310, 92 *S.Ct.* 2726, 2762, 33 *L.Ed.*2d 346, 390 (1972); *Ramseur, supra,* 106 *N.J.* at 183, 524 *A.*2d 188 (noting that death penalty statute must "limit imposition of the penalty to what is assumed to be the small group for which it is appropriate").

In *Gerald, supra,* we observed that there was no state-of-mind requirement under the SBI murder statute with regard to the actual result of death, but that a defendant "need act only with the purpose or knowledge that serious bodily injury result," 113 *N.J.* at 83, 549 *A.*2d 792, a conclusion that obviously was influenced by

our determination that a defendant convicted under that statute was not death-eligible, *id.* at 85, 549 *A.2d* 792. Although the constitutional amendment by its terms resolves any constitutional challenge to the SBI murder statute under the cruel and unusual punishment clause of the State Constitution, that amendment does not affect the question of constitutionality under the Federal Constitution.

In *Enmund, supra,* the United States Supreme Court reversed the defendant's sentence of death, holding that the death penalty should not be imposed "in the absence of proof that [the defendant] killed or attempted to kill, and regardless of whether [the defendant] intended or contemplated that life would be taken." 458 *U.S.* at 801, 102 *S.Ct.* at 3379, 73 *L.Ed.*2d at 1154. The Supreme Court later narrowed its prohibition on the imposition of the death penalty on one who did not kill, attempt to kill or intend that a killing occur. It held, in *Tison, supra,* that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." *Tison, supra,* 481 *U.S.* at 157–58, 107 *S.Ct.* at 1687–88, 95 *L.Ed.*2d at 144. Thus, *Tison* and *Enmund* stand for the proposition that a sufficient connection between the victim's death and the defendant's state of mind is required under the Eighth and Fourteenth Amendments to the Federal Constitution before a defendant can be found death-eligible. *Tison, supra,* 481 *U.S.* at 157–58, 107 *S.Ct.* at 1688, 95 *L.Ed.*2d at 144; *Enmund, supra,* 458 *U.S.* at 801, 102 *S.Ct.* at 3379, 73 *L.Ed.*2d at 1154.

The legislative history of the *Gerald* amendment indicates that, in SBI capital murder cases, the death penalty should be applied only to those heinous crimes in which the defendant's state of mind is substantially consistent with that required for purposeful or knowing murder. *New Jersey Assembly Judiciary, Law and Public Safety Committee Statement to A.2113, 205th Leg., 2nd*

*Sess.* (Jan. 6, 1993) (clarifying that Legislature's intent regarding category of homicides eligible for death penalty has remained consistent since adoption of death penalty statute in 1982); Assemblyman Mikulak, *Remarks at the N.J. Assembly Judiciary, Law and Public Safety Committee Statement to A.2113, 205th Leg. 2nd Sess.* (Jan. 6, 1993) (observing that amendment eliminates that "tissue-thin" distinction between intentional murder and intentional infliction of serious bodily injury resulting in death); *Press Release from the Office of Governor Florio, Governor Florio Directs Attorney General to Review Implementation of Constitutional Change to Death Penalty,* (Nov. 18, 1992) (stating that those who commit heinous and atrocious SBI murders ought to be subject to ultimate punishment).

In our view, the structure of the Code also dictates the state of mind that must be satisfied for SBI capital murder. For the prosecution to prevail in a purposeful murder case, it must show that the defendant intended to cause death and that his or her conduct caused the death of another. *N.J.S.A.* 2C:11–3a(1). Similarly, for a conviction of knowing murder, the prosecution must prove that the defendant knew that his or her conduct was practically certain to cause death and that such conduct caused the death of another. *N.J.S.A.* 2C:11–3a(2). A lower degree of culpability is required to prove aggravated manslaughter, for which the prosecution must show that the defendant was aware of and consciously disregarded a substantial risk of death, *i.e.,* a probability that death would result, and that the defendant manifested extreme indifference to human life. *N.J.S.A.* 2C:11–4(a).

We are persuaded that to sustain a conviction for purposeful or knowing SBI capital murder a higher degree of culpability is required than the culpability standard that must be proved for aggravated manslaughter. We therefore hold that for the prosecution to prevail on a charge of purposeful SBI capital murder, it must prove that it was the defendant's conscious object to cause serious bodily injury that then resulted in the victim's death, knew that the injury created a substantial risk of death and

that it was highly probable that death would result. For the prosecution to prevail on a charge of knowing SBI capital murder, it must prove that the defendant was aware that it was practically certain that his conduct would cause serious bodily injury that then resulted in the victim's death, knew that the injury created a substantial risk of death and that it was highly probable that death would result. Those state-of-mind requirements not only are consistent with the Code's internal structure, but also satisfy federal constitutional standards imposed by the Eighth and Fourteenth Amendments.

B

A secondary issue in this appeal is whether the crime of non-capital SBI murder exists under our Code. The short answer is that it does, but we hold that the crime of non-capital SBI murder is to be confined to the same offense that we have described as capital SBI murder, the only distinction being that no notice of aggravating factors is served in non-capital SBI murder cases. See *R.* 3:13–4(a). Accordingly, to convict a defendant on a charge of purposeful, non-capital SBI murder the State must prove that the defendant's conscious object was to cause serious bodily injury that then resulted in the victim's death, knew that the injury created a substantial risk of death and that it was highly probable that death would result. To prevail on a charge of knowing non-capital SBI murder the State must prove that the defendant was aware that it was practically certain that his conduct would cause serious bodily injury that then resulted in the victim's death, knew that the injury created a substantial risk of death and that it was highly probable that death would result. Although in the case of non-capital SBI murder those state-of-mind requirements implicate no constitutional concerns, we impose the identical state-of-mind standard that we mandate for SBI capital murder to assure the Code's internal consistency.

Read literally, the Code also authorizes the prosecution of a different category of non-capital SBI murder involving homicides

in which the defendant purposely or knowingly caused serious bodily injury consisting of an injury that, although not creating a substantial risk of death that was highly probable to occur, causes "serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." However, as we observed in *Simon, supra,* "not every purposeful or knowing stabbing or shooting or conduct of an actor that results in death will satisfy the SBI murder requirement." 161 *N.J.* at 451, 737 *A.*2d 1.

In our view, to broaden the crime of non-capital SBI murder to include homicides involving infliction of serious bodily injury where it is not highly probable that death will result would compromise the internal consistency of the Code. An example would be a homicide resulting from a deliberately inflicted gunshot wound to a victim's knee that, although not creating a substantial risk of death that was highly probable, nevertheless results in death. Defendants charged with such homicides ordinarily should be prosecuted for aggravated manslaughter or manslaughter. See *N.J.S.A.* 2C:11–4a and b. In that fashion, the crimes of capital and non-capital SBI murder will be charged only with respect to those defendants who allegedly satisfy the state-of-mind standard established in this opinion. *Supra* at 418, 749 *A.*2d at 840.

IV

Subject to appropriate modifications made by the Trial Judges Committee On Capital Causes, we conclude that the substance of the following charge should be included in the instructions to the jury in capital cases in which the State also seeks a conviction for SBI murder:

In order for you to find the defendant guilty of murder, the State is required to prove each of the following elements beyond a reasonable doubt:

(1) that the defendant caused the victim's death or serious bodily injury that then resulted in the victim's death, and

(2) that the defendant did so purposely or knowingly.

A person who causes another's death does so purposely when it is the person's conscious object to cause death or serious bodily injury. A person who causes another's death does so knowingly when the person is aware that it is practically certain that his conduct will cause death or serious bodily injury.

Whether the killing is committed purposely or knowingly, causing death or serious bodily injury must be within the design or contemplation of the defendant.

"Serious bodily injury" means bodily injury that creates a substantial risk of death. A substantial risk of death exists where it is highly probable that the injury will result in death.

All jurors do not have to agree unanimously concerning which form of murder is present so long as all believe it was one form of murder or the other. However, for a defendant to be subject to capital punishment, all jurors must agree that the defendant by his own conduct either purposely or knowingly caused death or serious bodily injury. All jurors must also agree that the defendant knew of and disregarded a substantial risk of death—that is, that it was highly probable that death would result from the infliction of serious bodily injury.

We remand this matter to the Law Division for further proceedings in accordance with this opinion.

*For modification and remandment*—Chief Justice PORITZ and Justices O'HERN, GARIBALDI, STEIN, COLEMAN, LONG and VERNIERO—7.

*Opposed*—None.