1 A.3d 796 (2010)
415 N.J. Super. 257
STATE of New Jersey, Plaintiff-Respondent,
v.
Michael J. RAMSEY, Defendant-Appellant.
Docket No. A-1024-08T1
Superior Court of New Jersey, Appellate Division.
Argued June 3, 2010.
Decided August 10, 2010.
*797 Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Kirsch, of counsel and on the brief).
James L. McConnell, Assistant Prosecutor, argued the cause for respondent (A. Peter DeMarco, Jr., Acting Somerset County Prosecutor, attorney; Mr. McConnell, of counsel and on the brief).
Appellant filed a pro se supplemental brief.
Before Judges STERN, GRAVES and J.N. HARRIS.
The opinion of the court was delivered by
STERN, P.J.A.D.
Defendant was convicted of murder and sentenced to life imprisonment with thirty years of parole ineligibility to be served consecutively to another sentence he was then serving. A conviction for possession of a firearm for an unlawful purpose was merged therein. On this direct appeal defendant asserts as plain error that aggravated manslaughter should have been charged as a lesser-included offense and that "the matter should be remanded for resentencing," because a parole ineligibility term of eighty-five percent was not imposed under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, and, if it had been, the judge would not have imposed a life sentence. He further attacks what the judgment calls $5000 in restitution. We affirm the conviction, but remand for resentencing.

I
On the evening of August 10, 2006, Terrell Spruill, then fifteen-years old, was shot to death on a street corner in Franklin Township by a person in a passing car. At the trial, defendant did not contest that a "murder" occurred, and did not assert that any lesser-included offense should have been charged. Rather, he claimed he was not at the scene and did not commit the murder, and that the murder was committed by a third party, Tyrone Chiles.
Detective Patrick Colligan testified that when he arrived at the scene, he talked to Dyshon Reeves, a bystander, who was a possible eyewitness. According to Colligan, Reeves was "pacing and screaming" about how he was going to kill "M-Dot," which is defendant's street name.
*798 Reeves testified that defendant, who he knew from the Grove area of town where Reeves used to live, was in the back seat of a car, and pointed a gun directly at him, as the car passed by. Upon noticing that the gun was pointed at him, Reeves "stepped back" and put his hands above his head. He stated he was not sure if it was defendant, but he heard someone in the car say, "that's Dyshon, that's Dyshon," and the car kept going.
Gary Marroquin also testified that prior to the incident he, Reeves, and Curtis Prescott were standing about five feet from the curb on the sidewalk of Victor Street in front of the victim's house. According to Marroquin, a car drove up the street at an average speed and slowed down upon approaching them. He saw defendant with "his whole body like up to his stomach ... hanging out" of the passenger window of the back seat with what appeared to be a gun in his hands. At this point, Marroquin was not positive of what he heard but it seemed like someone inside the vehicle said, "nah, nah, like it seemed like they knew Dyshon," and realized it was him. Upon hearing this, defendant retreated back in the car and the car drove off.
Prescott also testified that a man leaned out the window of a passing car with a gun and, after hearing someone in the car say "nah, nah," the person pulled the gun "back in the car," and the car continued to drive down the street.
In the meantime, while the three men were standing on the sidewalk of Victor Street, Spruill and Jamyllah Booker had been talking at the nearby corner of Matilda Avenue and Mark Street. They were joined by Diana Williams. According to Booker, she, Williams, and Spruill had been talking for about fifteen minutes when she heard "three to four" gunshot "sounds." After hearing the shots, Booker, Spruill, and Williams all started to run. Booker testified that she stopped and turned around upon hearing Spruill say he had been shot.
Williams testified for the defense that she "bumped into" Spruill and Booker on the corner of Matilda Avenue and Mark Street, and joined their conversation. During the conversation, Williams noticed a car come around driving slowly, although she did not see who was in the car. According to Williams, after about five minutes, the car she had noticed earlier came around again. The second time around, the car "slowed down and then it stopped" at which point she heard four gunshots. In her statement to the police after the incident, Williams indicated that the shooter "reached out of the window of the car [from the chest up] and he shot" Spruill. Although she could not make any identification at the trial, in her statement to police immediately after the event, she stated that Tyrone Chiles was in the car and had shot the victim.[1]
Eric Anderson was called by the State. He was in the car with defendant and Stacia Simms during the shooting, and gave a statement to the police on August 15, 2006. In his statement, he indicated that on the night of the incident, he saw defendant "pull a gun out and shoot it when he was in the back seat." Anderson said he heard three or four shots being fired and he saw that "[d]efendant's hand, arm, and body" "up to his upper chest" were out the window. Anderson also told Detective Colligan that they drove past the victim and the two girls once, and after driving past them defendant wanted to go around again. During the second time *799 around, defendant fired the shots. However, at trial, Anderson testified that he saw and recalled very little from the night in question, and the statements he had provided on August 15, 2006, were not true.
Simms, the driver of the vehicle, also gave a statement to the police that she saw defendant in possession of a firearm and gave a description of the firearm. Simms also indicated in her statement that they passed by the area where the victim and the two girls were standing twice. She stated that the second time around "the guy got shot" and she heard what sounded like firecrackers. Moreover, Simms stated that she heard a girl scream, and as she was driving away she heard defendant "laughing in the car." However, like Anderson, Simms testified at the trial that the statement she had given previously was false.[2]
The victim was transported to Robert Wood Johnson Hospital in New Brunswick, but died the same night. The medical examiner concluded that the cause of the victim's death was a "[g]unshot wound of the abdomen."
Tyrone Chiles and his sister, Constance, testified for the State that he was at the Menlo Park Mall at the time of the shooting. Moreover, the defendant's palm print was found on the back passenger window of the vehicle after it was located, and the defense acknowledged he had previously been in the car.
Defendant insists that aggravated manslaughter and manslaughter should have been charged as lesser-included offenses to murder despite his counsel's agreement with the judge and prosecutor during the charge conference that it was not an issue in the case.[3] This appeal therefore presents another situation in which we must consider the judge's independent obligation to assure a fair trial and just result when an error is invited or counsel acquiesces in a ruling at trial regarding the jury instructions.
Certainly, the Code of Criminal Justice was designed to assure a conviction for the right degree of offense by grading offenses based on the culpability of the defendant and the loss or injury to the victim. It codified the law of lesser-included offenses and when lesser-included offenses should be presented to the fact finder. See N.J.S.A. 2C:1-8(d), (e). As our Supreme Court has emphasized since the Code's adoption, a judge has an independent obligation to charge lesser-included offenses when they are presented by the evidence and there is a "rational basis" for determining that the jury could acquit on the greater offense and convict on the lesser. See State v. Brent, 137 N.J. 107, 644 A.2d 583 (1994). See also State v. Jenkins, 178 N.J. 347, 364, 840 A.2d 242 (2004); State v. Garron, 177 N.J. 147, 180, 827 A.2d 243 (2003), cert. denied, 540 U.S. 1160, 124 S.Ct. 1169, 157 L.Ed.2d 1204 (2004); State v. Powell, 84 N.J. 305, 318-19, 419 A.2d 406 (1980). On the other hand, while related lesser offenses may be charged at defendant's request, there can be no presentation of a lesser offense over defendant's objection, or without his or her consent, if it is not an elemental lesser-included offense because of defendant's *800 lack of notice and right to indictment. See State v. Thomas, 187 N.J. 119, 130-32, 900 A.2d 797 (2006).[4] There is no dispute that aggravated manslaughter and manslaughter are true lesser-included offenses to murder,[5] and can be charged, if warranted, in a murder case with or without consent.
We have real concerns about a defendant's ability to seek reversal based on the failure to charge the jury on a lesser-included offense after objecting to such a charge or agreeing it should not be given. A defendant has little to risk if he could gamble "all or nothing" on the outcome and obtain a reversal upon conviction if the lesser offense were clearly indicated by the evidence.[6] The Code was designed to avoid this. See State v. Garron, supra, 177 N.J. at 180, 827 A.2d 243; State v. Sloane, 111 N.J. 293, 299-304, 544 A.2d 826 (1988); Powell, supra, 84 N.J. at 317-19, 419 A.2d 406.
But the scope of review in this case is controlled by Jenkins, supra, 178 N.J. at 359-64, 840 A.2d 242, in which the Court held that the invited error rule did not apply to preclude reversal of a murder conviction where the defendant argued against instructing the jury on lesser-included offenses to murder. According to the Court in Jenkins:
The criminal analog of invited error also is designed to prevent defendants from manipulating the system. Therefore, the invited-error doctrine, like its civil-law counterpart, is implicated only when a defendant in some way has led the court into error. Conversely, when there is no evidence that the court in any way relied on a defendant's position, it cannot be said that a defendant has manipulated the system. Some measure of reliance by the court is necessary for the invited-error doctrine to come into play. Accord Platt v. U.S., 163 F.2d 165, 168 (10th Cir.1947) (in forfeiture proceeding invited-error standard not applied when position at trial did not mislead court or "cause it to fall into error").
With those concepts in mind, we now address the trial court's decision not to instruct on lesser-included offenses pertaining to homicide. At the charging conference, defense counsel explained that he believed the facts supported an *801 instruction on manslaughter, but that his client requested that the court refrain from charging the jury on lesser-included offenses. Although the prosecutor maintained that a conviction for aggravated manslaughter or reckless manslaughter could be returned on the evidence presented and reminded the trial court of its independent duty to make that determination irrespective of defendant's position, the court agreed with defendant.
The court's stated reasons for its decision, however, are revealing. The court acknowledged the obligation to make its own determination whether to instruct on lesser-included offenses. It then made that determination according to its understanding of the law as applied to the facts of this case:
[F]rankly, II don't see how a jury could find that this was reckless conduct. I mean . . . the evidence is not in conflict certainly as to what took place here and II don't think a reasonable jury could find in any way that ifif this offense was committed by the defendant, hethe offense was committed other than in a purposeful and knowing manner. I mean the victim in this case washad his, evidently, back to the perpetrator of the crime and there's no way that the jury could find reasonably that the striking of this person was done in anything other than purposeful, knowing, intentional manner.
. . . .
[A]lthough the Prosecutor points out, the Court isis obligated to charge included offenses whether or not the defendant wants them and the Court does not have to simply accede to the position of the defendant. In this case I think the defendant isishe mayhe may have his tactical reasons but I think that on the law, his position is correct.
Although the trial court acceded to defendant's request, those comments make clear that the court arrived at the decision not to instruct on lesser-included offenses independently of any invitation or encouragement by defendant. As such, the doctrine of invited error does not apply.
However, because defendant did not object to the lack of such an instruction, we will review the decision not to instruct on lesser-included offenses under a plain-error standard.
[Jenkins, supra, 178 N.J. at 359-60, 840 A.2d 242.][7]
See also State v. Walker, 203 N.J. 73, 999 A.2d 450 (2010) (failure to charge the affirmative defense to felony murder when defendant did not request it was an error but did not warrant a new trial).
Thus, the issue becomes whether the evidence required the judge to charge aggravated manslaughter and manslaughter as lesser-included offenses, as the judge seems to have made his decision not to include the charge without relying on defendant's position. At the charge conference, the judge stated that, because defendant "agree[d] that Terrell Spruill was shot and killed . . . . but the police got the wrong guy[,]" he did not see any lesser-included offenses in the case, and asked defense counsel "do you see any lesser includeds on this[,]" and defense counsel said, "[n]o, judge." Whether or not there was judicial reliance on defendant's position, if there was an improper failure to *802 charge, we must perform a "harmless error" analysis. In other words, following Jenkins, we "first must determine whether the trial court erred" in not charging the lesser-included offenses and, if so, whether "the mistake `was clearly capable of producing an unjust result such that a reasonable doubt is raised as to whether the error led the jury to a result it otherwise might not have reached.'" Jenkins, supra, 178 N.J. at 360-61, 840 A.2d 242 (quoting State v. Brims, 168 N.J. 297, 306, 774 A.2d 441 (2001)). Moreover, "because correct jury charges are especially critical in guiding deliberations in criminal matters, improper instructions on material issues are presumed to constitute reversible error." Ibid. See also Walker, supra, 203 N.J. at ___-___, 999 A.2d 450.
In that connection, Jenkins also developed the distinction between murder and manslaughter:
In State v. Cruz, 163 N.J. 403, 749 A.2d 832 (2000), however, we addressed the differences between the state-of-mind requirement for aggravated manslaughter and the state of mind required for murder premised on the infliction of serious bodily injury, i.e., "SBI murder." We explained that SBI murder involves a higher degree of culpability than does aggravated manslaughter. Id. at 417, 749 A.2d at 840. Aggravated manslaughter requires the State to prove that "the defendant was aware of and consciously disregarded a substantial risk of death, i.e., a probability that death would result, and that the defendant manifested extreme indifference to human life." Ibid. (emphasis added). However, to obtain a conviction for "purposeful" SBI murder, the State must do more. It must demonstrate that "defendant's conscious object [was] to cause serious bodily injury that then resulted in the victim's death" and that defendant "knew that the injury created a substantial risk of death and that it was highly probable that death would result." Id. at 417-18, 749 A.2d at 840 (emphasis added). Similarly, to prove "knowing" SBI murder, the State must make the same showing, except that, rather than proving that serious bodily injury was defendant's conscious objective, it need only demonstrate that he "was aware that it was practically certain that his conduct would cause serious bodily injury." Id. at 418, 749 A.2d at 840 (emphasis added).
Thus, the following key distinctions emerge. To be guilty of SBI murder, the defendant must have knowingly or purposely inflicted serious bodily injury with actual knowledge that the injury created a substantial risk of death and that it was "highly probable" that death would result. In aggravated manslaughter, by contrast, the defendant must have caused death with an "awareness and conscious disregard of the probability of death." If, instead, the defendant disregarded only a "possibility" of death, the result is reckless manslaughter. State v. Breakiron, 108 N.J. 591, 605, 532 A.2d 199, 206 (1987); State v. Pearson, 318 N.J.Super. 123, 136, 723 A.2d 84, 90 (App.Div.1999).
[Jenkins, supra, 178 N.J. at 362-63, 840 A.2d 242.]
In Jenkins, the State presented evidence indicating that in retaliation for the victim testifying against the defendant in a previous murder trial, the defendant struck the victim in the head with a brick. Id. at 363, 840 A.2d 242. The brick hit the victim causing him to fall down a flight of stairs headfirst to the pavement below. Ibid. The Supreme Court found that the trial court wrongly focused on the defendant's state of mind with respect to the act (striking someone in the head with a brick) *803 rather than on the defendant's state of mind with regards to the risk of death. Ibid. The trial court reasoned that "[f]inding no evidence of anything other than an intentional act that ultimately resulted in death, . . . a jury could not rationally find the existence of mere reckless conduct." Id. at 362, 840 A.2d 242. Accordingly, the trial court declined to instruct the jury on aggravated manslaughter "[b]elieving that the evidence presented at trial would sustain only a verdict of murder or acquittal." Ibid.
We reversed and the Supreme Court affirmed our judgment, holding that the trial court erred in not instructing the jury on aggravated manslaughter and manslaughter, and the failure to do so constituted reversible error. Id. at 364, 840 A.2d 242. The Supreme Court noted that the jurors "could have concluded that defendant hit the victim without conscious knowledge that death was a high probability but, instead, with reckless disregard of the possibility or probability that death would occur." Id. at 363, 840 A.2d 242. The Supreme Court found that significant support for its conclusion came from the fact that expert testimony indicated "it was not defendant's blow" that caused the victim's death; rather it was "the subsequent fall to the pavement that caused [the victim's] death." Id. at 364, 840 A.2d 242. Furthermore, the jurors "could have rationally concluded that defendant struck the victim not knowing serious bodily injury would result in the victim's death, or not knowing that the injury created a substantial risk of death and it was highly probable that death would result." Id. at 363-64, 840 A.2d 242. Properly focused, there was a "rational basis" by which a jury could have convicted the defendant of aggravated manslaughter or manslaughter while acquitting him of murder. Therefore, the failure to instruct the jury on the lesser-included offenses constituted reversible error. Ibid.
Similarly, in State v. O'Carroll, 385 N.J.Super. 211, 232, 896 A.2d 1125 (App. Div.2006), we found that a "jury could have found that rather than intending [the victim's] death, or knowing that her death was the likely result of his actions, defendant consciously disregarded a known risk with either a probability or possibility that death would follow from his conduct." Id. at 233, 896 A.2d 1125. In O'Carroll, the defendant strangled the victim with a telephone cord. Id. at 217, 896 A.2d 1125. There was no causation issue because the cause of death was asphyxiation due to strangulation; however, there were several facts showing a "rational basis" for the jury to conclude that the defendant acted recklessly with regards to the risk of death rather than purposely or knowingly. Id. at 232, 896 A.2d 1125. A significant fact was the defendant's statement to the police that he had been in a violent struggle with the victim and began choking her only to prevent her from stabbing him. Id. at 229, 896 A.2d 1125. In addition, testimony from the victim's sister and a childhood friend revealed that they had both witnessed the victim in the past initiating arguments with the defendant, and even kicked and hit him without the defendant striking back. Id. at 232, 896 A.2d 1125. Finally, the court noted that a medical examiner's testimony revealed "the possibility that the telephone cord was wrapped just once around [the victim's] neck, and that defendant did not consistently apply pressure, allowing the possibility that he did not intend to kill [the victim]." Ibid.
In the present case, none of the facts presented at trial indicate that the person who fired the gun did so because he was trying to prevent the victim from doing something, or during a fight or an emotional rage. Nor is there is evidence to *804 show defendant acted out of defense for himself, or anyone else. Walker, supra. The evidence in this case indicates the victim was shot from a short distance, or at close range, while having a conversation with two young women. In other words, this case is quite different than Jenkins and O'Carroll on which defendant relies.
In State v. Simon, 161 N.J. 416, 449, 737 A.2d 1 (1999) the defendant fired two shots within six feet at the victim's upper body causing the victim's death. The defendant argued that his guilty plea could not sustain a conviction for capital murder. He maintained that when he fired a gun at close range twice he only intended "to get the officer away from him because he did not wish to return to prison" and "was unaware that firing two shots within six feet at [the victim's] upper body region was `practically certain' to cause death or serious bodily injury that results in death." Id. at 449, 737 A.2d 1. The Simon Court found that the defendant's factual basis was adequate because the acknowledged facts were sufficient to demonstrate that the defendant was aware, at the time of the act, that firing two shots within six feet at the victim's upper body region was "practically certain" to cause death or serious bodily injury that results in death. Id. at 449-50, 737 A.2d 1.
According to Justice Coleman:
In addition to defendant's own words, common sense informs us that when someone shoots at another person in the upper body region, such as the neck and head, the shooter's purpose is either to cause serious bodily injury that results in death or to actually cause death, especially where no other plausible explanation is given. Although defendant claims he did not specifically aim his gun at Sergeant Gonzalez's upper body region, he admits that he intended the bullet to hit the victim and that his purpose in shooting Sergeant Gonzalez was to cause serious bodily injury if not to kill him. Moreover, the circumstances under which defendant shot the victimat close range, two shots, not one, to the upper body regionmanifested an indifference to whether the victim was killed instantly or eventually died from the infliction of serious bodily injury. Therefore, defendant's plea established that he had the requisite mens rea for purposeful or knowing murder pursuant to N.J.S.A. 2C:11-3a(1) and (2), and the trial court did not err in finding that defendant acknowledged a mental state required for capital murder.
[Id. at 450, 737 A.2d 1 (emphasis added).]
Similarly, in State v. Rose, 112 N.J. 454, 482-83, 548 A.2d 1058 (1988), the Court found that the trial court's refusal to charge the jury on the lesser-included offense of aggravated manslaughter was not an error since the evidence produced at trial "was far too speculative and insubstantial" to provide a "rational basis" for such a verdict. In Rose, the defendant argued that aggravated manslaughter should have been charged because there was some evidence in the record to indicate that the shooting was accidental and not intentional. Id. at 482, 548 A.2d 1058. In support of this argument, the defendant pointed to testimony from his companion on the night of the incident which demonstrated that he was shocked when the defendant shot the officer. The defendant also referred to the testimony from a woman he called after the shooting which indicated that the defendant was crying and nervous. Id. at 480, 548 A.2d 1058. Despite *805 this evidence, the Court found "that the overwhelming weight of the proofs . . . establish[ed] that defendant's act of firing the shotgun was volitional." Id. at 482, 548 A.2d 1058.
We decline to find reversible error in this case. There appears to be no "rational basis" in the record on which to find defendant not guilty of murder and guilty of aggravated manslaughter or manslaughter. Here, while debatable in terms of whether defendant was looking for a particular victim (or selecting one at random because he lived in another part of town, and not shooting the first possible victim, Dyshon Reeves, because he was known to defendant or a fellow passenger), it cannot reasonably be said that shooting a victim in the abdomen upon discharge of a firearm four times, in close range (within five to ten feet of the defendant),[8] involved mere reckless conduct or a conscious disregard of a substantial risk of death. Rather, under the circumstances, without any other explanation, and in the absence of a request for a charge on the lesser-included offenses, the trial judge had no obligation to charge aggravated manslaughter or manslaughter.[9]See Jenkins, supra, 178 N.J. at 363-64, 840 A.2d 242; State v. Choice, 98 N.J. 295, 297-301, 486 A.2d 833 (1985).

II
Defendant attacks his sentence as excessive. The State insists defendant's prior convictions as a juvenile and adult and six violations of probation justify the life term. However, here, the judgment does not include the mandatory NERA ineligibility term, and the judge did not refer to it in sentencing. Therefore, he clearly did not "consider the defendant's eligibility for release under the law governing parole . . . in determining the appropriate term of imprisonment," N.J.S.A. 2C:44-1(c)(2), or impose a mandatory sentence. A thirty-year ineligibility term was imposed whereas NERA, as of the time of this offense, now requires a defendant to serve eighty-five percent of seventy-five years, that is sixty-three and three-quarter years, before parole eligibility on a life sentence. See also N.J.S.A. 2C:11-3(b). N.J.S.A. 2C:43-7.2(b). Under these circumstances, we remand for resentencing at which consideration of the period of parole ineligibility, or real time, should be considered in setting the specific term. See also N.J.S.A. 2C:43-2(e). The restitution issue can also be reconsidered at the remand proceedings.
Affirmed and remanded.
NOTES
[1] Before stating that the shooter was Chiles, Williams indicated she was "60 percent" sure it was defendant when she was taken to a show up of defendant upon his arrest.
[2] Gross hearings had been conducted resulting in the admission of the prior inconsistent statements. See State v. Gross, 121 N.J. 1, 577 A.2d 806 (1990). In his pro se supplementary brief, defendant attacks these determinations as well as the failure to charge lesser-included offenses. We find no need to comment further on this subject. R. 2:11-3(e)(2).
[3] When asked directly, counsel stated the lesser-included offenses were not in the case and should not be included in the charge. See infra at 266, 1 A.3d at 801-02.
[4] In State v. Thomas, 187 N.J. 119, 900 A.2d 797 (2006), the Supreme Court developed the distinction between lesser-included offenses, as defined in N.J.S.A. 2C:1-8(d), which must be charged if there is "a rational basis in the evidence to support a charge on that included offense[,]" Thomas, supra, 187 N.J. at 131, 900 A.2d 797, and a "related offense," that is "offenses that share a common factual ground, but not a commonality in statutory elements, with the crimes charged in the indictment." Id. at 132, 900 A.2d 797. Because of the constitutional right of indictment, a related offense can be charged only by "waiver by the defendant," flowing from his or her consent or request for the charge, ibid.; see also id. at 133, 900 A.2d 797; and when "there is a rational basis in the evidence to sustain the related offense." Id. at 133, 900 A.2d 797.
[5] Reckless culpability is a lesser culpability to purposeful or knowing conduct. See N.J.S.A. 2C:2-2(b)(1), (2), (3); State v. Murphy, 185 N.J.Super. 72, 75-76, 447 A.2d 219 (Law Div. 1982); State v. Sewell, 127 N.J. 133, 149, 603 A.2d 21 (1992) (citing II The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission, commentary to § 2C:2-2, at 41-42 (1971)) (noting "that recklessness resembles knowledge in that both involve a state of awareness: awareness in knowledge being `certainty' of a result, that of `recklessness' involving the conscious disregard of a `substantial and unjustifiable risk' that a result will occur.").
[6] In fact, defendant would undoubtedly argue he was convicted as a result of a compromise verdict and denied due process, if aggravated manslaughter and manslaughter were charged and he was convicted of either.
[7] In light of Thomas, 187 N.J. 119, 900 A.2d 797, we doubt the same analysis would apply to an offense that is not an elemental lesser-included offense in the absence of defendant's consent.
[8] Neither Williams nor Booker estimated a distance, but we can reasonably conclude it was ten feet or less based on the totality of the evidence presented.
[9] In sentencing defendant, the trial judge stated his belief that defendant was "just out to kill somebody that night, and it didn't matter who." He added that the victim was "ambush[ed]" apparently because he lived in the Parkside area of town, whereas the driver and passengers of the car were from the Grove district. Reeves was spared because he was recognized and "apparently liked."