**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5137-17

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LUIS MANGUAL,

    Defendant-Appellant.

_____

Submitted January 12, 2021 – Decided February 22, 2021

Before Judges Fisher and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 14-10-2506 and 14-10-2508.

Joseph E. Krakora, Public Defender, attorney for appellant (Anderson D. Harkov, Designated Counsel, on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

On the evening of December 28, 2013, Jose Alfaro got into an argument outside his home on Mt. Prospect Avenue in Newark with his neighbor, Eduardo Arce. The argument ended when defendant Luis Mangual – as witnessed by others who so testified at trial – shot Alfaro right between the eyes. Mangual was convicted of all the charges contained in two indictments: the first-degree murder of Jose Alfaro, N.J.S.A. 2C:11-3(a); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a); and second-degree being a person not entitled to be in possession of a handgun, N.J.S.A. 2C:39-7(b). He was sentenced to an aggregate fifty-five-year prison term, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Defendant appeals, presenting numerous issues for our consideration. Through appointed counsel and by way of his own supplemental brief, defendant argues: (1) the judge erred in failing to charge the jury on the lesser-included offense of aggravated manslaughter; (2) the judge failed to instruct the jury about how it should deliberate; (3) the judge should have suppressed the out-of-court identifications made by Fidel Alfaro and Jose Evaristo Amaya; (4) the prosecutor engaged in misconduct; (5) the judge erred by not giving a third-

party guilt instruction to the jury; (6) trial counsel was ineffective in failing "to perceive or preserve constitutional error for appeal"; (7) the judge mistakenly admitted into evidence "altered photos of defendant"; (8) the judge abused his discretion by failing to answer a question from a juror near the end of the trial; (9) the verdict was against the weight of the evidence; (10) "consideration of issues raised for the first time on appeal is warranted to address errors of constitutional dimension affecting defendant's right to a fair trial"; (11) "the cumulative effect of the errors, combined with trial counsel's omissions, deprived defendant of a fair trial"; and (12) the judge imposed an excessive sentence.[1] We find no merit in these arguments.

I

In his first point, defendant argues that the judge erred in refusing to instruct the jury about the lesser-included offense of aggravated manslaughter. We reject this contention.

Trial judges must instruct juries on lesser-included offenses so long as there is evidence that would support a conviction on that lesser basis. See

---

[1] The brief of defendant's counsel contained the first, second, third and twelfth points. Defendant filed a pro se supplemental brief that reprised the third point and included eight other arguments, all of which we have renumbered for convenience's sake.

N.J.S.A. 2C:1-8(d)(1) (lesser-included offenses are "established by proof of the same or less than all the facts required to establish the commission of the offense charged"). Aggravated manslaughter, on which defendant sought an instruction, involved the same elements of knowing and purposeful murder except that the defendant's state of mind need only consist of an intent to "recklessly cause[] death under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4(a)(1). The question for the trial judge – in considering defendant's request for instructions on this lesser-included offense – was whether the evidence would support a finding that defendant acted only "recklessly" rather than purposefully or knowingly, or with passion or by provocation.[2]

We reject defendant's argument that the evidence would support a finding of recklessness. The evidence reflected only that defendant acted deliberately and was, at best, provoked by the argument between Arce and the victim. That defendant fired a single shot at the victim, at close range, and hit Jose Alfaro directly between the eyes exemplifies the deliberateness and lack of recklessness in defendant's actions.

---

[2] The judge instructed the jury on passion/provocation.

In arguing to us that the judge erred in refusing to instruct on aggravated manslaughter, defendant relies only on the testimony of two eyewitnesses: Cruz Amaya and Jose Amaya. Defendant's argument, however, is based on a mischaracterization of their testimony. Their versions of events do not allow for a finding that defendant acted recklessly, only purposefully and knowingly or through passion or provocation. The testimony of these two witnesses cannot support the argument defendant presents to us that he "fired one shot wildly towards Amaya and the victim when they were standing next to each other, and he was probably not aiming at the victim." For example, Cruz Amaya gave the following testimony:

> Q. So the defendant took out a weapon. And then what happened after the defendant took out a weapon?
>
> A. He starts threatening.
>
> Q. How is he threatening? What does that mean?
>
> A. With the weapon.
>
> Q. Okay, let me ask you. Is he saying something or is he pointing the weapon somewhere or is there something else going on?
>
> A. No, he's pointing his weapon.
>
> Q. So the defendant's pointing the weapon, the gun?
>
> A. Yes.

5

Q. And what happens?

A. Later, they made like they were leaving.

Q. How did they make like they were leaving?

A. They turned around like they were leaving to their house. I don't know.

Q. Okay, and then what happened?

A. Then, finally, he takes out his handgun and shoots at my uncle.

Q. And when you say "he," you mean the defendant?

A. Yes.

Q. Did you see the defendant shoot your uncle?

A. Yes.

Q. Where were you standing when the defendant shot your uncle?

A. Behind my uncle's back.

Jose Amaya gave this testimony, upon which defendant relies in support of the theory espoused in his first point:

Q. And what did he do, the taller guy?

A. He ordered [defendant] to shoot him.

Q. To shoot who?

A-5137-17

A.  Jose Alfaro.

     . . . .

Q.  When he said to shoot the victim, who was he talking to?

A.  To him.

Q.  The defendant?

A.  Yes.

Q.  What did the defendant do after the tall guy told him to shoot?

A.  He raised his hand and fired at him.

Q.  Did you actually see the shot?

A.  Perfectly.

Q.  When he raised his hand, did he point it at the victim?

A.  Yes.

Q.  What happened to the victim after he got shot?

A.  He fell and I said, "They killed him."

     . . . .

Q.  Now you just said that, at the time, you said, "They killed him."  How many people shot the victim?

A.  Only one person.

A-5137-17

Q. And that's the defendant?

A. Yes.

Contrary to defendant's argument, these witnesses provided no evidence from which a jury could rationally find that defendant acted recklessly. See State v. Mejia, 141 N.J. 475, 489 (1995). The judge correctly rejected defendant's request for a charge of aggravated manslaughter. Accord State v. Rose, 112 N.J. 454, 480-83 (1988); State v. Ramsey, 415 N.J. Super. 257, 267-69 (App. Div. 2010).

II

In his second point, defendant argues that he was deprived of a fair trial because the judge did not instruct the jury about deliberations, as in the following instructions:

> There is nothing different in the way a jury is to consider the proof in a criminal case from that in which all reasonable persons treat any questions depending upon evidence presented to them. You are expected to use your own good common sense; consider the evidence for only those purposes for which it has been admitted and give it a reasonable and fair construction in the light of your knowledge of how people behave. It is the quality of the evidence, not simply the number of witnesses that control[s].
>
> As I said before, any exhibit that has not been marked into evidence cannot be given to you in the jury room even though it may have been marked for identification.

Only those items marked in evidence can be given to you.

Very shortly you will go into the jury room to start your deliberations. I remind you that, during deliberations, and, in fact, any time that you are in the jury deliberation room, you must keep any cell phone, pager or other communication device you may possess turned off.

You are to apply the law as I have instructed you to the facts as you find them to be, for the purpose of arriving at a fair and correct verdict. The verdict must represent the considered judgment of each juror and must be unanimous as to each charge. This means all of you must agree if the defendant is guilty or not guilty on each charge.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. You are not partisans. You are judges – judges of the facts.

Defendant is correct that, when orally instructing the jury, the judge omitted this portion of the charge. Defense counsel did not alert the judge to this omission and she did not object when the judge completed her instructions.

9

So, we examine the impact of the omission under the plain-error standard, which precludes our intervention unless we may conclude that the omission from the oral version was clearly capable of producing an unjust result. See R. 2:10-2; State v. Funderburg, 225 N.J. 66, 79 (2016).

In undertaking this analysis, we consider the whole of the charge. See State v. R.B., 183 N.J. 308, 324-25 (2005); State v. Wilbely, 63 N.J. 420, 422 (1973). Other than the fact that the judge included these instructions in the written charge given to the jury at the completion of the oral charge, we note that the judge's oral instructions throughout the trial contained instructions akin to those inadvertently omitted.

For instance, at other times the judge instructed the jury that: it was their "sworn duty to arrive at a just conclusion after considering all the evidence which was presented during the course of the trial" and disregard excluded evidence; their verdict was to be unanimous and based solely on the evidence presented during the trial; they were the sole judges of the facts; and cellphones and other similar devices were to be turned off during the trial and deliberations. The judge instructed that the jurors were obligated to adhere to the judge's instructions, keep an open mind, and weigh the evidence "calmly and without passion, prejudice, or sympathy" and to decide the issues upon the merits.

We are satisfied from an examination of all the judge's instructions throughout the trial that the jury had already been advised of the content of the omitted five paragraphs and understood it was "to deliberate objectively, freely, and with an untrammeled mind." State v. Czachor, 82 N.J. 392, 402 (1980).

III

In defendant's third argument, he contends that the judge erred by failing to find the out-of-court photo identifications of defendant by Fidel Alfaro and Jose Evaristo Amaya overly suggestive and, thus, inadmissible. We disagree.

By way of background, we note that several individuals were present at the December 28, 2013 shooting; this group included four individuals who testified: Fidel Alfaro (the victim's brother); Cruz Amaya (the victim's nephew); Jose Evaristo Amaya (a friend of the victim's); and Eduardo Arce (who had argued with the victim prior to the shooting). Cruz testified that he saw defendant shoot Jose Alfaro, and he made an in-court identification of defendant as the shooter. Jose Amaya similarly testified that he saw defendant shoot Jose Alfaro; he also selected defendant's photo from an array prior to trial and identified defendant as the shooter at trial. Eduardo Arce testified that he was present when Jose Alfaro was shot although he did not actually see the shooting; instead, he testified that, after hearing

11

a shot, he turned to see defendant walking toward him "laughing [and] putting the gun away." Prior to trial, Arce had selected defendant's photo out of an array.

Fidel Alfaro also selected defendant's photograph from an array shown to him by police and identified the photograph of defendant as depicting the man he saw shoot his brother. At trial, Fidel was unable to identify defendant as the shooter, although he did testify to witnessing the shooting.

On defendant's motion, the judge conducted a two-day Wade[3] hearing. Defendant's claim of an unduly suggestive and unreliable out-of-court identification by Fidel was based on his allegation that detectives improperly provided feedback, allowed multiple viewings of the photo array, improperly constructed the photo array by making defendant appear lighter-skinned than individuals in the other photos, and failed to inquire about whether the witnesses discussed the case between or among themselves.

Only Detectives Ventola and Perez testified at the Wade hearing. Their testimony focused predominantly on the process they followed when Fidel was shown a photo array, as well as the "unique situation" created by Fidel being both an eyewitness and the victim's nearest family member.

---

[3] United States v. Wade, 388 U.S. 218 (1967).

The testimony at the Wade hearing revealed that hours after the shooting, Fidel accompanied police from the scene and gave a formal statement; he later testified at trial that he did not speak with Cruz Amaya or Jose Evaristo Amaya before giving the statement. When then asked by police which of the two men shot his brother, Fidel told police he was "not sure." But Fidel later identified defendant when presented with a photo array on February 11, 2014. He was shown a series of six photographs by Detective Raphael Ramos, a "blind detective" without knowledge of the case; when shown the fourth photo, Fidel first said "[n]o" but soon after said, "[h]e looks familiar." Once all the photos were shown to him, Fidel asked to see them again, after which he identified the fourth photo – the photo of defendant – as the man who shot his brother.

After this identification was completed, Detectives Ventola and Perez spoke with Fidel. Detective Ventola testified at the Wade hearing that this conversation took place not because Fidel was a witness, but because he was the victim's brother and next of kin. Detective Ventola also believed that Fidel was scared and "asking for some kind of confirmation of . . . what's going to happen next" with the investigation. Recognizing the potential for a "feedback" problem, Detective Ventola testified he did not "at any point before or after" tell Fidel that he identified "the correct suspect" or identify for Fidel "who the suspect was."

Detective Ventola also testified that he knew that Fidel, Cruz, and Jose Amaya "lived essentially in the same building" with "some in the same apartment," and that they all were either related or were friends. Despite the proximity of the witnesses' living situations, and their familiarity with each other and the case, Detective Ventola testified that he did not ask Fidel, during his February identification, whether he had spoken to anyone else about the case. When confronted with the Attorney General's Guidelines for photo array and eyewitness identification procedures, Detective Ventola said he had never seen the Guidelines and admitted he did not follow them in asking the witness "whether he . . . had previously spoken to anyone (law enforcement or civilian) about the identification."

Detective Perez also testified at the Wade hearing about Fidel's out-of-court identification of defendant. He acknowledged that after the identification made during the photo-array procedure, Fidel asked a "question in reference to an individual that lives in close proximity to where he live[d]"; Detective Perez assumed he meant Eduardo Arce, the individual who was arguing with the victim and who was present with the defendant when the shooting occurred. Detective Perez testified that although he was aware he was not permitted to provide Fidel with any feedback, he nevertheless tried to "give him the positive of us continuing the investigation and [the identification] . . . part of the procedures and process" because

14

Fidel was the victim's next of kin. Detective Perez admitted he "could have probably chosen different words" but his overall intent was "to provide . . . the at least amount [sic] of information" without revealing that the person chosen from the array was the person who would be charged. He also stated that he did not ask whether Fidel had spoken to another person about the identification, and he admitted he told Fidel, after the photo-array procedure, that he was "glad" Fidel was "able to identify someone."

Once the two detectives finished their testimony, the State moved to conclude the hearing and asked for a denial of the defendant's suppression motion, orally setting forth the reasons why the State believed there were no faulty system variables at play, and why the conversations between the officers and Fidel after the identification were not impermissible feedback but merely "ambiguous statements made by the officers" that neither confirmed nor denied the accuracy of Fidel's identification. After a few brief comments, defense counsel sought the opportunity to submit a brief containing her arguments as to why the identification should be excluded from trial.

Based on the testimony of the two detectives, the trial judge denied defendant's motion for reasons expressed in a written opinion. Defendant now argues, among other things, that testimony elicited at the hearing demonstrated the

out-of-court identifications made by both Fidel Alfaro and Jose Amaya[4] were "unreliable and tainted by suggestive pretrial identification procedures." Because we substantially agree with the reasons expressed by the trial judge in her written opinion, we reject this argument without further comment. The judge made thorough findings, to which we defer, see State v. Robinson, 200 N.J. 1, 15 (2009), and rejected each of defendant's arguments.

First, the judge noted that defendant argued the identification was unduly suggestive because Fidel viewed the same six photographs twice. The judge held this did not violate the "multiple viewings" system variable, which prohibits the witness from viewing the suspect multiple times "as part of multiple identification procedures," State v. Henderson, 208 N.J. 208, 290 (2011), because, as the judge determined, "[o]nly one identification procedure was used in this case: a photo array."

Second, the judge rejected defendant's contention that the construction of the photo array was suggestive. This system variable prohibits an array that contains a photo of the suspect that stands out from the others. Ibid. Having examined the

_____

[4] Neither the State nor defendant elicited any testimony from the two detectives about the photo identification made by Jose Amaya.

photo array, the judge concluded that the photo array was not constructed in a suggestive way.[5]

Third, the judge rejected defendant's argument of another system variable: "private actors." Ibid. Defendant contended that since the witnesses knew each other and the victim, the detectives erred in not inquiring about discussions the witnesses may have had with each other. The judge rejected this, noting that the witnesses had been instructed by police not to discuss their identifications with anyone else and there was no evidence in the record to suggest they had.

Fourth, the judge rejected the contention that the detectives gave Fidel positive feedback about his identification. The judge credited the detectives' testimony that no one told Fidel directly or indirectly "who the suspect was." They merely gave Fidel an update on the investigation, without identifying for him the suspect or the individual he identified.

After close examination, we are satisfied that the testimony adduced during the Wade hearing fully supported each of the judge's findings and conclusions.

In appealing, however, defendant also argues that the judge erred by failing "to conduct a full evidentiary hearing by requiring Fidel and [Jose Amaya] to

---

[5] The record on appeal does not contain the photo array or the video recordings of the identification procedures.

testify." We reject this contention as well. When the Henderson Court revamped the way in which courts are to determine the admissibility of an out-of-court identification, it did not impose on the State, once a determination was made that a hearing was required, an obligation to call every witness with personal knowledge of the identification procedures. The Court clearly stated that the accused always possesses the initial burden of showing suggestiveness that could lead to a mistaken identification in order to obtain a hearing. Henderson, 208 N.J. at 288. Once the decision is made to conduct a hearing, the State has the burden of offering "proof to show that the proffered eyewitness identification is reliable – accounting for system and estimator variables," while the trial court "can end the hearing at any time if it finds from the testimony that defendant's threshold allegation of suggestiveness is groundless." Id. at 289. In the third step described by the Court, "the ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification" and, "[t]o do so, a defendant can cross-examine eyewitnesses and police officials and present witnesses and other relevant evidence linked to system and estimator variables." Ibid. (emphasis added).

The defense called no witnesses. The State called the two detectives to testify and defense counsel thoroughly cross-examined both. The judge did not terminate the hearing, as permitted by Henderson, 208 N.J. at 289. Instead, once the second

18

detective's testimony was completed, the prosecutor immediately moved for a ruling in the State's favor and explained why he felt entitled to this relief. In response, defense counsel did not assert that the hearing hadn't ended or that she had witnesses to call; defense counsel merely stated that she would prefer to put her argument in writing once she had the transcript of the first day of hearing.

We do not agree that defense counsel's enigmatic comment after the hearing had concluded, and the discussion that occurred about when defendant would submit a written summation on the issue, is the equivalent of a request for an opportunity to call a witness. That is, after the second detective testified, after the prosecutor asked for a ruling in the State's favor, after the prosecutor explained orally why he believed defendant's motion should have been denied, and after defense counsel asked for time to file a written summation, the judge asked defense counsel whether there was any issue "about the other witness," likely meaning Jose Amaya. Defense counsel then asserted that the "only person who can truly testify to that is Mr. Alfaro," perhaps meaning that only Fidel could testify about whether he spoke with other eyewitnesses prior to the photo-array identification. Defense counsel concluded these brief comments as to what would be contained in the written submission with, "I think that should be – should warrant a hearing where Mr. Alfaro should have to

19

testify to explain what happened." The judge did not respond to that comment but instead said, "Okay. Moving forward, when will we expect a trial date?"

Considering the timing of defense counsel's statement about the need for Fidel's testimony at the <u>Wade</u> hearing, assuming that is what that last comment meant, we conclude that the allegation now made – that Fidel and perhaps others should have been called to testify about whether they spoke about the shooting and the suspect either before or after the photo identifications – was not preserved for appellate review. Moreover, we note the abundance of eyewitness testimony at trial, including in-court identifications of defendant as the shooter, and the thorough instructions about system and estimator variables the jury could consider when considering proof of out-of-court identifications, all of which demonstrate that any claimed error about the scope of the <u>Wade</u> hearing was harmless.

IV

We find insufficient merit in the remainder of defendant's arguments to warrant discussion in written opinion. <u>R.</u> 2:11-3(e)(2). We add only a few brief comments as to each.[6]

---

[6] We express no view on defendant's argument in his sixth point that his trial attorney was ineffective for failing to request "appropriate jury instructions." In this point, defendant does not describe the instructions he believes his attorney should have requested, but we assume that this argument relates to the third-

A-5137-17

In his fourth argument, defendant contends that the prosecutor exceeded the bounds of proper advocacy. The statement in question concerned Cruz Amaya and his statements soon after the shooting that he wasn't sure he would be able to identify the culprit. Cruz never made a photo identification of defendant, only identifying defendant as the shooter at the time of trial. In his summation, the prosecutor gave the following argument that defendant now claims was improper:

> Cruz is scared in his first statement [to police]. He never lies about anything but, he's scared. He doesn't say anything false but he says ["]ah, I don't know if I could recognize [the shooter"]. Hours earlier he just saw someone murdered right in front of his face. Not just in front of his face, in front of his home. The place where he's supposed to be safe. He knows that the guy who just shot and killed Jose Alfaro knows where he lives and he tells the police in his first statement ["]I don't know if I'd be able to recognize him["] and then he comes and says ["]yeah, you know what? I'd be able to recognize him.["] And he comes into court and he recognizes him. And he recognizes him because he's never going to forget that face because again, he saw him from as close as basically you and I are now. But, he saw him kill somebody and that's just not something he's going to forget.

party guilt charge that defendant contends was warranted and, perhaps, the instructions referred to in defendant's first and second points. This ineffectiveness argument is best left for consideration at the post-conviction stage; if then pursued, defendant would be able to develop a more fulsome record in an attempt to illuminate why counsel failed to request what defendant now believes should have been instructed. R. 3:22-2(e).

21

Although, in one respect – with the statement that Cruz "never lies about anything" – the prosecutor engaged in improper vouching, the balance of the summation as a whole represented a legitimate and proper argument about the evidence and the inferences the jury might draw from Cruz's earlier professed inability to make an identification.

Because defendant did not object to these statements at the time of trial, we review the inappropriate vouching for Cruz Amaya using the plain-error standard. We conclude that the statement, in the overall context of the case, was incapable of producing an unjust result.

Defendant's contention in his fifth point, that the judge should have instructed the jury on third-party guilt, is without merit because the instruction was never requested. His seventh point, in which he contends a detective altered photos used in a photo array, is without merit because there was no evidence of such an alteration.

In his eighth point, defendant argues that the judge erred "by not answering" a question posed by a juror at the end of the third day of trial. The transcript reveals that as the judge was giving the standard instructions at the close of the day's testimony, a juror interrupted with: "Can I ask you a

22

question?"  The judge called the juror to sidebar, and the juror posed the following:

> I just wanted to – the defendant was arrested when the gentleman that was supposedly with him identified?  I just want to confirm with that?  Like what – we never got clarification as to when and how he was arrested.

The judge responded only with:  "That's a question I cannot answer at sidebar." Defendant's argument is that the judge abused her discretion by not answering this question.  We find this argument lacks sufficient merit to warrant further discussion.  R. 2:11-3(e)(2).  To the extent defendant's argument may be interpreted as claiming the judge should have required the State to elicit such testimony from one or more witnesses also lacks merit and warrants no further discussion.  Ibid.

Defendant argues in his ninth point that the verdict was against the weight of the evidence.  Although the trial record is replete with evidence from which the jury could convict defendant beyond a reasonable doubt, this argument is not cognizable on appeal because defendant did not move for a new trial.  See R. 2:10-1.

Defendant's remaining arguments warrant no discussion beyond what has already been said in this opinion.  R. 2:11-3(e)(2).

We lastly reject defendant's arguments about the sentence imposed. The judge imposed a fifty-five-year NERA prison term on the murder conviction and lesser concurrent terms on the other convictions. The judge applied the third, sixth, and ninth aggravating factors, N.J.S.A. 2C:44-1(a)(3), (6), (9), because of defendant's extensive criminal history, which included eight arrests, seven dispositions of guilt, and one open aggravated assault charge. Defendant had previously received a seven-year prison term on drug offenses and was on parole when he killed Jose Alfaro. And while awaiting disposition of these matters, defendant was arrested and charged with aggravated assault based on an incident that occurred while he was incarcerated. The judge was thus entitled to find from defendant's criminal history that "a high risk of recidivism" existed. In addition, the judge was entitled to consider, in imposing a fifty-five-year term, that Jose Alfaro was "murdered in front of his residence . . . [and] in full view of his brother in a residential neighborhood[;] [the] shoot[ing] [of] an unarmed individual in a manner as cavalier as discarding a gum wrapper on a sidewalk, is indefensible." See State v. Megargel, 143 N.J. 484, 501 (1996); see also State in the Int. of C.A.H. & B.A.R., 89 N.J. 326, 337 (1982) (determining that "demands for deterrence are strengthened in direct proportion to the gravity and harmlessness of the offense and the deliberateness of the offender").

24

The judge found no mitigating factors, and defense counsel also recognized at sentencing that there "are no mitigating circumstances that I can present to this [c]ourt that would [a]ffect the [s]entence." Defendant now argues the judge should have found and applied mitigating factors four and thirteen. See N.J.S.A. 2C:44-1(b)(4), (13). Although not argued at sentencing and therefore not mentioned by the sentencing judge, we find no evidence in the record to support the application of either mitigating factor. The allegation that defendant acted on the orders of Arce, allegedly a higher-ranking gang member, does not trigger the thirteenth mitigating factor, which allows consideration whether a young offender's conduct was influenced by a more mature offender. And the fact that Arce and the victim were or had been engaged in a verbal argument does not present a "substantial ground[] tending to excuse or justify the defendant's conduct."

In the final analysis, we will not second-guess or intervene in a trial judge's sentencing decision if the sentence was imposed in accordance with the sentencing laws and guidelines. State v. Jabbour, 118 N.J. 1, 5-6 (1990). The judge imposed an entirely appropriate sentence well within the bounds of accepted legal principles. The sentence imposed was richly deserved and not "shock[ing] to the judicial conscience." State v. Roth, 95 N.J. 334, 363 (1984).

25

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-5137-17