**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1825-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MAYRA J. GAVILANEZ-
ALECTUS, a/k/a MAYRA J.
VILLICIS, MAYRA J.
GAVILANEZ-VERDEZOTO,
and MAYRA GAVILANEZ
VARGAS,

     Defendant-Appellant.

_____

Argued March 12, 2025 – Decided July 8, 2025

Before Judges Mayer, Rose and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 22-08-1446.

Tamar Y. Lerer, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

Amanda G. Schwartz, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Amanda G. Schwartz, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant Mayra J. Gavilanez-Alectus appeals from the February 8, 2023 amended judgment of conviction sentencing her to forty-five years in prison for murder, with a thirty-year mandatory minimum term subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. We affirm.

We recite the facts relevant to this appeal from the trial testimony. On May 17, 2020, defendant's wife, Rebecca Gavilanez-Alectus,[1] was found dead in the bedroom of their home. Rebecca was discovered lying in bed under a blanket, with "blood . . . everywhere, on the walls, on the bed." The medical examiner determined Rebecca's cause of death was blunt force trauma to the head.

Detective Sergeant Michael O'Hearn of the Ocean County Sheriff's Office (OCSO) Crime Scene Investigation (CSI) Unit processed the scene. He photographed a tray containing raw meat in the kitchen and collected a blood-stained shirt found on the bathroom counter and a wine chiller located on the

---

[1] Because defendant and the victim shared a common surname, we refer to the victim by her first name, with no disrespect intended.

bed near Rebecca. The chiller weighed about five and a half pounds and contained suspected blood on the inside lip.

Forensic analysis of defendant's cell phone revealed that on May 16, 2020, she conducted internet searches for airfare, a travel agency and Greyhound bus lines, and mapped the location of her phone at the Canal Street station in New York City. Ring camera footage from the same date showed defendant arrive at her home around 4:32 p.m. and leave at 5:15 p.m., driving her red 2005 Chrysler Pacifica. A license plate reader identified the car parked in front of a residence on East 40th Street in New York City at 7:11 p.m., where it remained.

Other camera surveillance showed defendant's car arrive at the New York address at 7:00 p.m. on May 16, 2020 and an individual in a red shirt exit the car and then enter a bank thirty minutes later. Defendant's bank records confirmed a $700 withdrawal from her account at that time.

Other surveillance footage from the same day showed the individual enter the Port Authority Bus Terminal, walk to the ticket counter and wait for a bus. Greyhound's records confirmed defendant purchased a bus ticket from New York to Miami, Florida, with a transfer in Richmond, Virginia.

Defendant boarded the bus and arrived in Richmond, where she approached Jessenia Murillo Ramos, introduced herself as Lorena, and asked

A-1825-22

Murillo Ramos for help in fleeing her abusive husband. Murillo Ramos called Jenny Fernandez-Nataren, with whom she lived, to ask if defendant could stay at their home in Texas for a few days. Unbeknownst to defendant, Fernandez-Nataren had been an informant for the Federal Bureau of Investigation (FBI) since 2006.

Defendant purchased a bus ticket to Houston with cash using the fictitious name, Lorena Rodriguez. She and Murillo Ramos met Fernandez-Nataren at the Houston bus station the next day, and defendant repeated to Fernandez-Nataren the same story she told Murillo Ramos.

Fernandez-Nataren testified that at 1:00 a.m. the next morning, defendant admitted she killed Rebecca. Defendant said Rebecca stopped answering her calls, but defendant convinced her to come to their house for her favorite dinner. Defendant told Fernandez-Nataren Rebecca bought cockroach poison on her way to the house.[2] Defendant said that when Rebecca arrived, they went upstairs to their bedroom and defendant gave her a massage. At some point, Rebecca asked defendant what defendant would do if she died.

---

[2] The State presented evidence at trial indicating defendant purchased mouse bait that morning.

A-1825-22

According to Fernandez-Nataren, defendant said Rebecca was tired and took a nap. When defendant went downstairs to cook dinner, she saw cockroach poison next to the food on the counter and, because of Rebecca's fatigue and comment about dying, suspected Rebecca poisoned herself or tampered with the food.

Defendant said she went into the bedroom and began hitting Rebecca, who woke up asking, "Why are you killing me?" Defendant claimed that at that moment, she heard a spirit telling her not to stop. Defendant explained she grabbed the wine chiller and when she was done, there was blood all over the room. Defendant then drove to New York and left her car there.

After her admission, defendant seemed "shaken up," so Fernandez-Nataren suggested she eat and bathe. Defendant was still wearing the same clothes she wore on the bus trip. When defendant undressed, Fernandez-Nataren observed what looked like blood on defendant's bra and gathered defendant's clothes in a bag.

Fernandez-Nataren testified that after defendant showered, defendant asked her to go to bed with her because she was scared. When asked by the State whether anything happened after they went to bed, Fernandez-Nataren testified "at one point, [defendant] got up and she started pushing on me, pushing

5                                                                          A-1825-22

on my throat, on my, close to my neck, on my chest and I told her, don't worry, don't worry, there's nothing here, you're in my house." Defendant did not object to this testimony.

The next day, Fernandez-Nataren told her FBI connection about defendant's story. Defendant was arrested and later transported to New Jersey.

On August 11, 2022, an Ocean County grand jury returned an indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); and fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d). A jury trial was held on September 19, 20, 21, 22, 27, 28 and 29, 2022.

During trial, Captain Matthew Armstrong, a fingerprint examiner in the OCSO CSI Unit, testified as an expert in latent fingerprint analysis. Prior to his testimony, the court read the model jury charge regarding expert testimony. Model Jury Charges (Criminal), "Expert Testimony" (rev. Nov. 10, 2003).

Armstrong testified fingerprint examination involves comparing latent fingerprints, which are hidden until they are developed, with known fingerprints or exemplars taken from a ten-fingerprint card. Armstrong explained he uses the analysis, comparison, evaluation and verification (ACE-V) method to examine fingerprints.

Armstrong stated the ACE-V method begins when he receives a latent fingerprint and examines the print, the material on which the print was left, the appearance of the surface and whether it is suitable for comparison to the ten-fingerprint card. Next, he conducts a side-by-side comparison between the latent and exemplar prints, where he examines three levels of detail, including basic patterns, minutia in the ridge characteristics and the pore structure in the ridges. In the last step, evaluation, he concludes whether the latent print is from the same source as the exemplar. After completing this process, the CSI Unit requires additional verification by two other print examiners. Results are only published if all examiners reach the same conclusion.

Armstrong then testified about the ACE-V results in defendant's case. He compared defendant's ten-fingerprint exemplar with the latent print developed from the inside lip of the wine chiller. Armstrong noted the Automated Fingerprint Identification System requires ten points of identification to be entered into the database, and the latent print recovered here had fourteen. He determined the same person's right thumb made the latent fingerprint and the print on the ten-fingerprint exemplar, and therefore concluded the latent print inside the wine chiller was made by defendant's right thumb. All examiners reached the same conclusion.

7

When asked by the prosecutor if he would have reached the same conclusion if the examiners had different opinions, Armstrong stated he had "never seen that" because they examined fingerprints and "[t]here's no opinion to be spoken. It's totally objective."

Armstrong further testified his evaluation was limited to the fingerprint analysis and examination, and he did not test the substance in which the print was found. The prosecutor asked, "What is your understanding as to what that print was in . . . ? What was explained to you?" Armstrong responded the print was developed with a chemical that reacts with amino acids in blood, so he understood the print was found in blood.

Armstrong then testified he examined "somewhere in the hundreds" of suspected bloody fingerprints. Based on that experience, he determined there was blood on defendant's finger when it touched the wine chiller because "the ridges . . . [we]re pronounced" and "[i]f there was blood poured on the fingerprint, then it would be everywhere." Defendant did not object to this testimony.

Jeffrey Scozzafava testified as an expert in bloodstain pattern analysis. Prior to Scozzafava's testimony, the judge reminded the jurors regarding "expert

8 <span>A-1825-22</span>

witnesses in general" and asked if they wanted the advisory repeated, to which the jury responded "no."

Scozzafava explained a bloodstain is "a visible stain left on something that's come into contact with the blood" and bloodstain pattern analysis is "a tool . . . similar to latent fingerprint development or fingerprint identification or even arson investigation, . . . [that] focuses on looking at stains and then looking if there are patterns within the stains to determine what the mechanism was that created the bloodstain pattern."

Scozzafava testified the FBI issued a validation study that determined bloodstain patterns were "predictably and accurately reproducible." He explained the scientific method to analyze a bloodstain requires the expert to gather data, study the data, form a hypothesis, and then verify the conclusion based on training and experience.

When asked by the prosecutor whether there was an error rate in analyzing bloodstains, Scozzafava explained:

> From the validation studies that I've read and being with different associations for private and public, when you're using proper methods, there's no error rate in bloodstain pattern analysis. There have been errors that have been pointed out, but that was human error and it was not following established methods for things like mis-measuring a stain or . . . misidentifying a bloodstain on a piece of fabric.

A-1825-22

Scozzafava testified about three different types of bloodstains: passive stains, which are produced without any force exerted on them; spatter stains, which are produced by forcible dispersion; and altered stains, which he described as blood clots. When asked by the prosecutor whether the types of bloodstains are easily distinguishable, Scozzafava said, "Sometimes they are. Sometimes they're not."

Scozzafava testified the dozens of bloodstains on the shirt found in defendant's bathroom were all passive transfers caused by contacting blood. Based on his examination of the crime scene photos, Scozzafava reached five conclusions: (1) the pillows on the bed had been moved after a blood-shedding event; (2) a one-inch area above the headboard with no bloodstain indicated something prevented blood from striking that area; (3) the area had bloodstains consistent with forcefully dispersed airborne spatter stains; (4) the bloodstains on the wall and headboard had been altered by the forcible dispersal of blood clots, showing there had been two beating events, one that caused the blood to clot and then a second that dispersed the clots; and (5) the bloodstains were consistent with a blunt force trauma event.

Kimberly Michalik, a forensic scientist for the New Jersey State Police Office of Forensic Sciences laboratory, testified as an expert in forensic DNA

analysis. Michalik explained the lab generates DNA profiles through a four-step process: extraction, quantitation, amplification and detection. The laboratory's standard practice includes examining twenty-seven locations on a DNA evidence sample because "the more DNA that [the laboratory] look[s] at, the more exclusionary a profile can be, so the more [they] can say that someone is the source of a DNA profile."

She further testified that after a DNA profile is created, the scientist examines known samples from a cheek swab or blood sample, comparing them to the unknown samples collected as evidence. Then, a statistical evaluation is performed "to give weight to that comparison . . . if the statistic reaches a certain threshold, [the scientist is then] able to competently say that someone is the source of that [DNA] profile." If the threshold is not met, the scientist can only say that someone matches that DNA profile. Michalik further testified statistical analysis is generated by examining "how frequent the profiles are within that population" and using that information to determine "how common or how rare the profile is."

In this case, Michalik examined two reference samples, one from Rebecca and one from defendant. Michalik testified she tested the samples and reached the following conclusions: (1) Rebecca was the source of the DNA on the wine

11  A-1825-22

chiller; (2) Rebecca was the source of the DNA on the blood stained portion of the shirt found in the bathroom; (3) the DNA from the shirt collar was a mixture from two people but insufficient for comparison purposes; and (4) Rebecca was the source of the DNA from the stain on defendant's bra. Defense counsel did not object to any of Michalik's conclusions and did not cross-examine her.

Dr. Dante Ragasa, the forensic pathologist who performed Rebecca's autopsy, testified as an expert in forensic pathology. Ragasa testified Rebecca sustained seven to nine lacerations on the top of her head, which exposed the skull on the left side of her head, and three to four depressed fractures on the skull. When asked by the prosecutor how much force was required to cause skull fractures, Ragasa explained:

> Well, it's variable. There's [sic] a lot of factors involved here. First, it's the strength of the individual, the assailant, . . . the strength of the weapon that was used and also the emotion of the assailant, which would, you know, if the assailant is enraged, even if they don't have that muscle strength and all that, but in a rage, it could create this kind of force.

Defendant did not object to Ragasa's testimony regarding force. On cross-examination, defense counsel asked whether the wine chiller could have inflicted Rebecca's blunt force injuries, and Ragasa replied yes. Ragasa explained the chiller had both a round cylindrical surface and sharp edges, either

12

of which could have caused the lacerations to Rebecca's head, but he could not determine with certainty what part of the cooler was used to inflict the injuries.

After the conclusion of testimony and closing arguments, the judge charged the jury. Relevant to the issues on appeal, the judge read the model jury charge on reasonable doubt. Model Jury Charges (Criminal), "Reasonable Doubt" (rev. Feb. 24, 1997). Although the judge's instruction was largely consistent with the model charge, she added a phrase to the following sentence: "If, based on your consideration of the evidence, you are firmly convinced of the defendant's guilt, more or less the defendant is guilty of the crime charged, you must find her guilty." (Emphasis added).

Consistent with the Model Jury Charges (Criminal), "Murder N.J.S.A. 2C:11-3(a)(1) and 3(a)(2)" (rev. June 14, 2004), the judge included the following instruction:

> A homicide or a killing with a deadly weapon such as [the] wine chiller in itself would permit you to draw an inference that the defendant's purpose was to take life or cause serious bodily injury resulting in death. A deadly weapon is any firearm or other weapon device, instrument, material or substance, which in the manner in which it is used or is intended to be used, is known to be capable of producing death or serious bodily injury. In your deliberations, you may consider the weapon used and the manner and circumstances of the killing, and if you are satisfied beyond a reasonable doubt that the defendant struck and killed [Rebecca]

with a wine chiller, you may draw an inference from the weapon used, that is the wine chiller, and from the manner and circumstances of the killing as to the defendant's purpose or knowledge.

The jury convicted defendant on all counts.

During the January 12, 2023 sentencing hearing, defense counsel acknowledged defendant was found guilty of first-degree murder, but argued it was a "situation where it wasn't premeditated murder. It was one that happened . . . in a very short period of time" and was "a passion/provocation type of manslaughter situation where . . . it set a trigger off in [defendant], she went upstairs into the bedroom and, yes, [Rebecca] lost her life." Counsel argued the court "need[ed] to consider that there[ were] lesser charges that should have been included in this deliberation with the jury."

The judge responded:

Three times, was it not, did we not discuss[] the inclusion of a lesser-included crime other than first-degree murder on at least three occasions, the first being at our in-chambers and then on-the-record conference required by the rules, the pre voir dire conference. At that time, you stated that you did not wish the court to charge the jury on any lesser-included offenses because it would interfere with your strategy. At that time, I let it go because the court recognizes it does have an independent duty to canvass the record. We didn't have a record at that point, but it was made very clear you did not want to have a lesser-included offenses [sic] at that time.

14

> We then talked about it again during the trial and then just before counsel came out for their summations, we talked about it again, and before you even gave your summations and before I brought everybody back, I put on the record what you wanted and you said, yes, Judge, we do not want any lesser includeds, and that was both the State and yourself. And it wasn't, it wasn't just because it contradicted your position, but that it could also imperil the jury's finding of her—it could also prod the jury towards finding her guilty of the first-degree murder charge.

Counsel explained he was "asking the court to have a little compassion" for his client. Pursuant to N.J.S.A. 2C:44-1(b), defendant argued mitigating factors seven (the defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present offense); eight (the defendant's conduct was the result of circumstances unlikely to recur); nine (the character and attitude of the defendant indicate that the defendant is unlikely to commit another offense); and ten (the defendant is particularly likely to respond affirmatively to probationary treatment).

Defendant also addressed the court:

> Okay. Okay. I would like to address specifically Rebecca's family. I would like to say that I'm really sorry for what happened, that I accept my responsibility, I accept my culpability. I know that—I don't know what happened. I don't know what happened. I know I feel the suffering and the same

15

suffering as the family because I lost my wife. And had I been aware of what I was doing, I wouldn't have done that. I simply lost myself. I don't know what happened.

This doesn't justify what I did. I only want that some day that they forgive me, because, how do I say this, I feel, this is not easy for me. It's something that I will carry with me for the rest of my life, because it wasn't only the loss of a daughter, a niece, a mom, an aunt, but I also lost my wife, my children, everything. And I swear that if I could do anything to go back and take that suffering away, I would, because I would have never want[ed] this hurt for them or for anybody.

I ask that some day you forgive me. I also ask that God forgive me for everything and Rebecca as well. I think that's, I think that's it.

The prosecutor objected to defense counsel's request for a sentence lower than that for first-degree murder, arguing it was "legally not possible in this case. [Defendant] was found guilty of first-degree murder by a jury. The mandatory minimum, as [the court] is aware, is thirty years in New Jersey State Prison, serve thirty years. And that's the mandatory minimum."

Pursuant to N.J.S.A. 2C:44-1(a), the State requested aggravating factors one (the nature and circumstances of the offenses, and the role of the actor in committing the offenses, including whether or not it was committed in an especially heinous, cruel, or depraved manner); two (the gravity and seriousness of harm inflicted on the victim, including whether or not the defendant knew or

16

reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to advanced age, ill-health, or extreme youth, or was for any other reason substantially incapable of exercising normal physical or mental power of resistance); three (the risk that the defendant will commit another offense); and nine (the need for deterring the defendant and others from violating the law).

In imposing sentence, the judge first addressed defendant's belated argument for lesser-included offenses of murder:

> Passion/provocation manslaughter has four elements. One is reasonable and adequate provocation; two is no cooling off time in the period between the provocation and the slaying; three, a defendant who actually was impassioned by the provocation; and four, a defendant who did not cool off before the slaying. And that's State v. Josephs, 174 N.J. 44 (2002).

> When analyzing these elements and determining whether or not to give a passion/provocation instruction, a trial court should look at the evidence in the light most favorable to the defendant. And that's State v. Noble, 398 N.J. Super. 574, 597 (App. Div. 2008).

> In 1994 the New Jersey Supreme Court discussed the issue of when a court has a duty to charge a jury sua sponte, meaning on [its] own, even without being requested to do so, on a passion/provocation manslaughter in its decision in State v. Robinson, 136 N.J. 476 (1994). In Robinson, the Supreme Court noted a trial court does not have the obligation on its own to

meticulously sift through the entire record in every murder trial to see if some combination of facts and inferences might rationally sustain a manslaughter charge. And that's id. at page 489.

Instead, the court's duty is to give the jury a manslaughter instruction where the facts clearly indicate the appropriateness of that charge. The Robinson Court held a trial court charging a jury sua sponte must find first that the two objective elements of passion/provocation manslaughter are clearly indicated by the evidence. If they are, the two subjective elements should almost always be left for the jury.

In viewing the first of the two objective elements, reasonable and adequate provocation, this court is of the opinion that the evidence presented at trial showed no provocation, reasonable, adequate or otherwise, to satisfy this element. In fact, there was no evidence of provocation. Defense counsel argues that the provocation could have been from, and I'm quoting, "evil presence of a spirit driving her actions" and/or "cockroach poisoning that the defendant believed was mixed into the evening supper the defendant was preparing for the victim."

The judge explained she did not charge the jury on the lesser offense because "the evidence in this case, even when viewed in a light most favorable to . . . defendant, showed there was no provocation to begin with, there [wa]s no time period where the defendant needed to cool off" and therefore, "the two objective elements of passion/provocation manslaughter were clearly not present in the evidence at trial."

18

The judge also addressed aggravated and reckless manslaughter:

> There was also no case made for reckless manslaughter as the evidence showed that there were at least two blood-shedding events, as the multiple blood rings from the wine cooler on the duvet evidenced. Additionally, because the harm inflicted the multiple gaping lacerations to the head as well as the multiple skull fractures went so far beyond the force needed to kill the victim, there could be no doubt that the crime here causing death goes well beyond even the highest degree of recklessness.

Considering aggravating and mitigating factors, the judge found aggravating factor one did not apply because "although [it] was a horrible bludgeoning," aggravating factor one would be "excessive."

The judge found aggravating factor two and assigned it heavy weight because it was "uncontroverted by all the scientific evidence produced at trial that Rebecca was asleep when she was bludgeoned to death. So she was incapable of exercising normal or mental powers of resistance."

The judge found aggravating factor three but gave it light weight because defendant was almost fifty-one years old and had no criminal history.

The judge also found aggravating factor nine and gave it "extremely heavy weight" because it was "obvious . . . this defendant showed no mercy, took advantage of someone she . . . should have been protecting, and instead, while she slept, mercilessly beat her to death with a wine chiller."

19

The judge found mitigating factor seven and afforded it moderate weight because "the risk that [defendant will] commit another offense is not great because she got through almost half a century of life without committing any crime whatsoever."

The judge did not find mitigating factor eight because "it could reoccur," stating, "Please don't tell me that since her wife is dead, she can't kill her again."

The judge also did not find mitigating factor nine because,

> in [defendant's] words . . . she's sorry, but she's also sorry not just for the fact that she no longer has a wife whom she killed, but she's sorry for herself and also for her own life, so [the court] can't find that she's unlikely to commit another offense.

The judge concluded the aggravating factors substantially outweighed the mitigating factors and sentenced the defendant to forty-five years with a mandatory thirty-year parole ineligibility term for murder. Both weapons offenses were merged into the murder conviction. The January 12, 2023 judgment of conviction was amended on February 8, 2023 to clarify the sentence was also subject to NERA.

Defendant raises the following issues on appeal:

POINT I

TESTIMONY PRESENTED BY MULTIPLE FORENSIC EXPERTS WAS UNRELIABLE,

BEYOND THE BOUNDS OF THEIR EXPERTISE, AND CONSTITUTED TESTIMONIAL HEARSAY. THE INAPPROPRIATE ADMISSION OF THIS PREJUDICIAL TESTIMONY REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

    A. The Fingerprint Examiner's Testimony Violated N.J.R.E. 702 and the Confrontation Clause.

    B. The Bloodstain Pattern Analyst's Testimony Violated N.J.R.E. 702.

    C. The DNA Expert's Testimony Violated N.J.R.E. 702 and 403.

    D. The Pathologist's Testimony Violated N.J.R.E. 702.

    E. The Inappropriate Testimony from Four Forensic Experts Requires Reversal of Defendant's Convictions.

POINT II

A NUMBER OF INSTRUCTIONAL ERRORS PREVENTED THE JURY FROM APPROPRIATELY DETERMINING DEFENDANT'S CULPABILITY. DEFENDANT'S CONVICTIONS MUST BE REVERSED.

    A. The Instruction that the Jury Could Infer that Defendant Meant to Kill Because of the use of a Wine Chiller as a Weapon was Erroneous, Prejudicial, and Requires Reversal of Defendant's Convictions.

21

B. The Failure to Charge Any Lesser-Included Offenses of Murder Requires Reversal of Defendant's Convictions.

C. The Inappropriate Instruction on the Meaning of Reasonable Doubt Necessitates Reversal of Defendant's Convictions.

D. Individually and Cumulatively, the Instructional Errors Require Reversal of Defendant's Convictions.

POINT III

THE ADMISSION OF IRRELEVANT AND INFLAMMATORY EVIDENCE THAT DEFENDANT HAD ATTACKED A WITNESS REQUIRES REVERSAL OF HER CONVICTIONS.

POINT IV

EVEN IF ANY ONE OF THE COMPLAINED-OF ERRORS WOULD BE INSUFFICIENT TO WARRANT REVERSAL, THE CUMULATIVE EFFECT OF THOSE ERRORS WAS TO DENY DEFENDANT DUE PROCESS AND A FAIR TRIAL.

POINT V

THE SENTENCE OF [FORTY-FIVE] YEARS IS EXCESSIVE FOR DEFENDANT, WHO WAS [FIFTY] YEARS OLD AT THE TIME OF SENTENCING AND WAS A FIRST-TIME OFFENDER.

22

I.

In point one, defendant argues the State's forensic experts violated the Rules of Evidence throughout the trial by giving opinions that were scientifically unreliable, beyond the scope of their expertise, or consisted of testimonial hearsay, which inappropriately strengthened the State's case against her.

We review a trial court's evidentiary rulings for abuse of discretion. State v. Martinez-Mejia, 477 N.J. Super. 325, 334 (App. Div. 2023) (citing State v. Garcia, 245 N.J. 412, 430 (2021)). When, as here, there was no objection to the admission of evidence at trial, we review for plain error. R. 2:10-2. Plain error is an error "clearly capable of producing an unjust result." State v. Trinidad, 241 N.J. 425, 445 (2020) (quoting R. 2:10-2). Plain error "is a 'high bar,' State v. Santamaria, 236 N.J. 390, 404 (2019), requiring reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached,' State v. Macon, 57 N.J. 325, 336 (1971)." Trinidad, 241 N.J. at 445.

N.J.R.E. 702 governs the admissibility of expert testimony: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto

in the form of an opinion or otherwise."  The party seeking admission of expert testimony must demonstrate:

> (1) the subject matter of the testimony must be "beyond the ken of the average juror"; (2) the field of inquiry "must be at a state of the art such that an expert's testimony could be sufficiently reliable"; and (3) "the witness must have sufficient expertise to offer the" testimony.
>
> [State v. Olenowski, 253 N.J. 133, 143 (2023) (emphasis omitted) (quoting State v. J.L.G., 234 N.J. 265, 280 (2018)).]

Defendant belatedly argues Armstrong's testimony violated N.J.R.E. 702 and the Confrontation Clause[3] by improperly stating:   (1) fingerprint examination is "totally objective," implying there was no error rate; (2) two other examiners assessed defendant's fingerprint and agreed it matched the fingerprint at the scene, which was inadmissible hearsay; and (3) how the blood got onto the fingerprint and the wine chiller, which was outside his expertise.

Armstrong explained the ACE-V method of examining fingerprints, including the requirement that two other examiners agree with a conclusion before results are published, and confirmed two examiners concurred with his

---

[3]  Because defendant's merits brief does not address her Confrontation Clause argument, this issue is waived.  See State v. Shangzhen Huang, 461 N.J. Super. 119, 125 (App. Div. 2018); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2025) (noting "an issue not briefed is deemed waived").

conclusion in this case. Relying on out-of-state cases that are not binding on this court, defendant argues Armstrong's use of the word "objective" created an "inescapable inference that there is no error rate in fingerprint examination." We disagree. Armstrong's statement was part of his expert testimony, and the judge instructed the jurors they were entitled to accept or reject all or part of Armstrong's testimony.

We are also unpersuaded Armstrong's statement that two other examiners agreed with his identification was testimonial hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted, N.J.R.E. 801(c), and is inadmissible unless a recognized hearsay exception applies, N.J.R.E. 802.

Expert witnesses may testify about out-of-court statements upon which they rely "if that hearsay is of the type 'reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" State v. Torres, 183 N.J. 554, 576 (2005) (citing N.J.R.E. 703). In this context, the hearsay statements are not offered for "establishing the truth of their contents, but to apprise the jury of the basis of the opinion reached." Ibid. (quoting State v. Humanik, 199 N.J. Super. 283, 305 (App. Div. 1985)).

Armstrong's testimony regarding the other examiners' verification was offered for the limited purpose of explaining to the jury his identification conformed with the ACE-V process, and the State did not comment on this testimony in its summation. Thus, we discern no plain error in its admission.

Defendant also contends Armstrong's testimony exceeded his expertise by opining how blood contacted the fingerprint and wine chiller. Armstrong testified the print was developed using a chemical that reacts with blood. Based on his review of "hundreds" of prints similar to this case, he stated blood was present on the finger when it touched the wine chiller because the ridges were "pronounced," and if blood had been cast on top of an existing print, the blood would have been between the furrows and ridges. Because Armstrong's testimony sufficiently related to his expertise in fingerprint identification, we are unconvinced it went beyond the scope of his expertise.

Defendant next argues Scozzafava's testimony violated N.J.R.E. 702 by stating there was no error rate in blood spatter analysis. Scozzafava explained his opinion was based on a review of validation studies, including studies from the FBI, and the use of proper identification methods. He further clarified this statement by explaining error may occur, but it is caused by human mistake. We

discern no error allowing this testimony, which the jury was free to accept or reject.

Defendant next argues Michalik's testimony was misleading and violated N.J.R.E. 403 and 702 because she "did not give any supporting statistic for the jury to evaluate the weight of" her determination Rebecca was the source of the blood found on the wine chiller, the shirt and defendant's bra. Citing to out-of-state case law not binding on this court, defendant argues DNA expert testimony must be presented with statistical weight to give proper context to its meaning.

We are unpersuaded Michalik's testimony impermissibly misled the jury. Michalik testified a certain statistical threshold must be met for a DNA analyst to determine a person is the source of a generated DNA profile, and that threshold was met in this case. Because there is no binding precedent requiring a DNA expert to provide a jury with the numerical statistical probability underpinning the expert's conclusion, we discern no plain error in the jury's consideration of Michalik's testimony, which the jury was free to accept or reject.

Defendant also contends Ragasa's testimony regarding the force necessary to cause a skull fracture violated N.J.R.E. 702 because it constituted an opinion

of defendant's state of mind and exceeded the scope of his expertise. We disagree.

A forensic pathologist is "an 'expert in investigating and evaluating cases of sudden, unexpected, suspicious, and violent death.'" State v. Locascio, 425 N.J. Super. 474, 490 (App. Div. 2012) (quoting 1-1 Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties, § 1.9 (6th ed. 2011)). "[A] forensic pathologist's testimony is [] restricted to describing the mechanics of death." Ibid. (second alteration in original) (quoting State v. Jamerson, 153 N.J. 318, 338 (1998)). It is well established that an expert witness may not offer an opinion as to the defendant's guilt. State v. Cain, 224 N.J. 410, 429 (2016). However, even if improper expert testimony is elicited, a reversal of defendant's conviction is warranted only if that testimony was sufficiently prejudicial to have the capacity to bring about an unjust result. State v. Nesbitt, 185 N.J. 504, 518-19 (2006).

Defendant cites Jamerson, arguing Ragasa's testimony "should have been limited to describing the physical properties of the implement that caused the [victim's] death[], narrating the physiological status of the bod[y] at the time of death, and ruling out the possibility that the injuries were self-inflicted or sustained as a result of mere inadvertence." 153 N.J. at 337. Defendant further

cites <u>Locascio</u>, in which we determined a medical examiner's opinion based on numerous biomechanical factors went beyond his expertise. 425 N.J. Super. at 494.

Ragasa's testimony is distinguishable from the testimony we deemed impermissible in both cases. <u>Jamerson</u> concerned a medical examiner's testimony that a motor vehicle accident was the result of the defendant's recklessness, and <u>Locascio</u> involved a medical examiner's testimony regarding the biomechanics of a car accident, both of which are clearly outside the bounds of expertise in pathology. Here, however, Ragasa's general opinion about the force necessary to create a skull fracture, including the strength of the individual, the weapon used and the emotion involved, was within the bounds of his expertise as a pathologist. Because Ragasa did not opine as to defendant's emotion or state of mind specifically, we are unconvinced his testimony violated N.J.R.E. 702.

## II.

We next address defendant's challenge to the jury charges. When a defendant objects to a jury instruction at the time of trial, we review the instruction for harmless error. <u>State v. Cooper</u>, 256 N.J. 593, 607 (2024) (citing <u>Willner v. Vertical Reality, Inc.</u>, 235 N.J. 65, 80 (2018)). Conversely, when a

defendant claims a trial court's jury instruction was in error, but the defendant "fail[ed] to object . . . at [the time of] trial, the standard on appeal is one of plain error." Ibid. (quoting Willner, 235 N.J. at 80).

In the context of a jury charge, "plain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" State v. Montalvo, 229 N.J. 300, 321 (2017) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). We "read the charge as a whole," State v. Jordan, 147 N.J. 409, 422 (1997), and "the error must be evaluated 'in light of the overall strength of the State's case.'" State v. Sanchez-Medina, 231 N.J. 452, 468 (2018) (quoting State v. Galicia, 210 N.J. 364, 388 (2012)). "No party is entitled to have the jury charged in his or her own words; all that is necessary is that the charge as a whole be accurate." Jordan, 147 N.J. at 422.

Defendant first argues that because a wine chiller is not a deadly weapon within the meaning of the model jury charge, the charge should not have been given.

The model jury charge for murder reads, in pertinent part:

A-1825-22

A homicide or a killing with a deadly weapon, such as (describe the deadly weapon used) in itself would permit you to draw an inference that the defendant's purpose was to take life or cause serious bodily injury resulting in death. A deadly weapon is any firearm or other weapon, device, instrument, material or substance, which in the manner it is used or is intended to be used, is known to be capable of producing death or serious bodily injury. In your deliberations you may consider the weapon used and the manner and circumstances of the killing, and if you are satisfied beyond a reasonable doubt that the defendant (shot) (stabbed) and killed (insert victim's name) with a (gun) (knife) you may draw an inference from the weapon used, that is, the (gun) (knife), and from the manner and circumstances of the killing, as to the defendant's purpose or knowledge.

[Model Jury Charges (Criminal), "Murder (N.J.S.A. 2C:11-3(a)(1) and 3(a)(2))" (rev. June 14, 2004) (footnotes omitted).]

Defendant emphasizes that a wine chiller is not known to be capable of producing death or serious bodily injury when it is used in the manner in which it is intended. However, this argument ignores an alternative definition contained in the instruction, which includes any "device, . . . which in the manner it is used . . . , is known to be capable of producing death or serious bodily injury." The five-and-a-half-pound wine chiller, used to inflict multiple blunt force injuries to the victim's head and skull, was known to be capable of

31

producing death or serious bodily injury. We therefore discern no error in the judge's instruction.

Defendant next argues the court's failure to charge any lesser-included offenses of murder requires reversal of the convictions because "the possibility [defendant] acted with a different mental state, and was therefore guilty of a form of manslaughter, was 'obvious from the record' and 'indeed jump[ed] off the page.'" We disagree.

As the trial judge noted, defendant repeatedly objected to the inclusion of lesser-included offenses, arguing their inclusion because it conflicted with her defense and trial strategy. Thus, we consider her newly minted argument under the invited error doctrine. "Under the invited error doctrine, 'trial errors that "were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal."'" State v. Munafo, 222 N.J. 480, 487 (2015) (quoting State v. A.R., 213 N.J. 542, 561 (2013)). As our Supreme Court has explained, the invited error doctrine "does not permit a defendant to pursue a strategy . . . and then when the strategy does not work out as planned, cry foul and win a new trial." State v. Williams, 219 N.J. 89, 101 (2014). When considering whether an invited error requires reversal, we engage in "a close, balancing examination of the nature of the error, its impact on

the . . . jury's verdict, and the quality of defendant's motives and conduct in bringing about the error." State v. Harper, 128 N.J. Super. 270, 278 (App. Div. 1974).

Because defendant did not simply acquiesce to the jury instructions and instead objected to the inclusion of lesser-included offenses, the invited error doctrine applies. And even if we consider the merits of defendant's argument, we are unconvinced the judge erred by declining to charge passion/provocation, aggravated or reckless manslaughter.

The decision whether to charge a lesser-included offense of murder "rests primarily with the trial judge who must determine whether such a manslaughter instruction is appropriate in light of the facts of a particular case." State v. Bishop, 225 N.J. Super. 596, 602 (App. Div. 1988). "Where the evidence clearly raises an issue justifying a finding it must be charged even absent a request." Id. at 602-03 (emphasis omitted). "However, if the parties do not request a lesser-included-offense charge, reviewing courts 'apply a higher standard, requiring the unrequested charge to be "clearly indicated" from the record.'" State v. Fowler, 239 N.J. 171, 188 (2019) (quoting State v. Alexander, 233 N.J. 132, 143 (2018)).

This clearly indicated standard does not require trial courts to "scour the statutes to determine if there are some uncharged offenses of which the defendant may be guilty." State v. Brent, 137 N.J. 107, 118 (1994) (quoting State v. Sloane, 111 N.J. 293, 302 (1988)). "Nor does the trial court have 'the obligation on its own meticulously to sift through the entire record . . . to see if some combination of facts and inferences might rationally sustain' a lesser charge like manslaughter." State v. Funderburg, 225 N.J. 66, 81 (2016) (quoting State v. Choice, 98 N.J. 295, 299 (1985)). "Instead, the evidence supporting a lesser-included charge must 'jump[] off the page' to trigger a trial court's duty to sua sponte instruct a jury on that charge." Fowler, 239 N.J. at 188 (alteration in original) (quoting Alexander, 233 N.J. at 143).

As the judge further explained during sentencing, the evidence adduced during trial did not support a passion/provocation manslaughter charge. "Passion/provocation manslaughter is an intentional homicide committed under extenuating circumstances that mitigate the murder." Robinson, 136 N.J. at 481 (citing 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 7.10, at 252 (1986)). Passion/provocation manslaughter is when "[a] homicide which would otherwise be murder under [N.J.S.A.] 2C:11-3 is committed in the

heat of passion resulting from a reasonable provocation."  N.J.S.A. 2C:11-4(b)(2).

There are four elements to passion/provocation manslaughter:  (1) "the provocation must be adequate"; (2) "the defendant must not have had time to cool off between the provocation and the slaying"; (3) "the provocation must have actually impassioned the defendant"; and (4) "the defendant must not have actually cooled off before the slaying."  State v. Mauricio, 117 N.J. 402, 411 (1990) (citing LaFave & Scott, Jr., Substantive Criminal Law § 7.10, at 255). The first two elements are objective and are to be decided by the trial judge, while the last two are subjective and should be left to the jury's consideration. State v. Carrero, 229 N.J. 118, 129 (2017).

When evaluating whether provocation was adequate under the first prong, "'the provocation must be "sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control."'"  Ibid. (alterations in original) (quoting Mauricio, 117 N.J. at 412).  Here, the only provocation indicated in the record is defendant's statement to Fernandez-Nataren she saw poison on the kitchen counter and believed Rebecca either ingested it or tampered with the food.  We agree with the judge's sound determination that this

statement, taken in the light most favorable to defendant, failed to establish adequate provocation to support a passion/provocation charge.

Likewise, we are unconvinced the trial judge erred by not instructing the jury on aggravated or reckless manslaughter. An individual commits aggravated manslaughter when he or she "recklessly causes death under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4(a). To convict a defendant of aggravated manslaughter, the State must prove "the defendant was aware of and consciously disregarded a substantial risk of death, i.e., a probability that death would result, and that the defendant manifested extreme indifference to human life." State v. Cruz, 163 N.J. 403, 417 (2000). If the defendant disregarded only the possibility of death, the defendant would be guilty of reckless manslaughter. State v. Breakiron, 108 N.J. 591, 605 (1987).

As the judge explained, the evidence at trial showed there were at least two blood-shedding events perpetrated against Rebecca, who had no defensive wounds. The multiple skull fractures and gaping lacerations defendant inflicted with the wine chiller "went so far beyond the force needed to kill [Rebecca]." On this record, we are unconvinced a jury charge for aggravated or reckless manslaughter jumped off the page or that the alleged error in its omission was "sufficient to raise a reasonable doubt as to whether [it] led the jury to a result

it otherwise might not have reached." State v. Daniels, 182 N.J. 80, 95 (2004) (alteration in original) (quoting Macon, 57 N.J. at 336).

Defendant further argues the trial court inappropriately instructed the jury on the definition of reasonable doubt when it inserted "more or less" into the instruction, which "diluted the significance of reasonable doubt and diminished the State's burden."

"In a criminal prosecution, the State bears the burden of proving beyond a reasonable doubt every element of an offense." State v. Medina, 147 N.J. 43, 49 (1996). But "[n]either the New Jersey Constitution nor the Federal Constitution explicitly demands that trial courts define reasonable doubt. Both constitutions require only that the trial court inform the jury of the State's burden to prove the defendant's guilt beyond a reasonable doubt." Id. at 50. And "[n]either constitution defines reasonable doubt." Ibid. "Because the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof, reasonable-doubt instructions must be considered in their entirety." State v. Wakefield, 190 N.J. 397, 473 (2007) (quoting Medina, 147 N.J. at 51-52). "Taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." State v. Dreher, 302 N.J. Super. 408, 467 (App. Div. 1997). "Only those

instructions that overall lessen the State's burden of proof violate due process." Wakefield, 190 N.J. at 473 (quoting Medina, 147 N.J. at 51-52).

We agree the judge's inadvertent insertion of the phrase "more or less" into the jury charge was error because it did not conform with the model jury charge. However, having reviewed the entire jury charge issued, we are satisfied the error was harmless because, even with that minor modification, the charge sufficiently apprised the jury of its duty to determine whether the State met its burden of proof. The judge read the model jury charge regarding reasonable doubt both immediately after the jury was sworn and again as part of the final charge, and instructed that the State, and only the State, was required to prove each element of the offense beyond a reasonable doubt. Considering the jury charge as a whole, we are unconvinced the aberrant phrase lessened the State's burden of proof.

## III.

We next address defendant's contention she was denied due process and the right to a fair trial because the trial court allowed Fernandez-Nataren to testify defendant tried to choke her and "that something would happen" to her because defendant confessed to her, which violated N.J.R.E. 404(b)(1). Because defendant did not object to this testimony, we review for plain error. And

because defense counsel elicited an aspect of this testimony on cross-examination, we also consider application of invited error.

N.J.R.E. 404(b)(1) states "evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition."

On direct examination, Fernandez-Nataren testified she woke to defendant "pushing on [her] throat, . . . close to [her] neck, on [her] chest," while defendant said she was seeing blood. In response, Fernandez-Nataren reassured her not to worry because there was nothing in the house. On cross-examination, defense counsel asked whether Fernandez-Nataren told detectives defendant was "choking" her while screaming she needed help, to which the witness clarified she was asking for help.

Having reviewed the challenged testimony in context, we are satisfied it was not elicited as evidence of defendant's other bad acts. Neither side referred to the incident as evidence of defendant's disposition or argued her actions towards Fernandez-Nataren were in conformity with her actions against Rebecca. And even if the jury should not have considered this testimony, we are convinced any error was harmless, given the overwhelming evidence against defendant.

A-1825-22

IV.

Defendant argues the cumulative effect of the alleged errors denied her due process and a fair trial. The cumulative effect of trial errors may warrant reversal when it "casts doubt on the propriety of the jury verdict that was the product of that trial." State v. Jenewicz, 193 N.J. 440, 474 (2008). Reversal may be justified when the cumulative effect of a series of errors is harmful, even if each error itself is harmless. Id. at 473. "[T]he predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." Wakefield, 190 N.J. at 538.

We reject the majority of defendant's alleged errors and, to the extent we agree with certain contentions regarding improper testimony, we are unpersuaded those errors, taken collectively and in light of the overwhelming evidence against defendant, rendered the trial unfair. "A defendant is entitled to a fair trial but not a perfect one." State v. R.B., 183 N.J. 308, 334 (2005) (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).

V.

Lastly, defendant argues the forty-five-year sentence was excessive because she was fifty years old at the time of sentencing and a first-time offender.

We review sentencing determinations with a highly deferential standard. State v. Fuentes, 217 N.J. 57, 70 (2014). We "must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). Once the trial court has balanced the aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b), it "may impose a term within the permissible range for the offense." State v. Bieniek, 200 N.J. 601, 608 (2010); see also State v. Case, 220 N.J. 49, 65 (2014) (instructing that appellate courts may not substitute their judgment for that of the sentencing court, provided that the "aggravating and mitigating factors are identified [and] supported by competent, credible evidence in the record").

Having reviewed the record and the sentencing transcript, we are satisfied the judge identified and balanced the aggravating and mitigating factors, which were supported by competent, credible evidence in the record, and found the aggravating factors substantially outweighed the mitigating factors by clear and convincing evidence. On this record, given the judge's thoughtful consideration

41

of those factors, we are unpersuaded the forty-five-year sentence shocks the judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division